ACCEPTED
03-13-00370-CV
5055113
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/28/2015 8:22:12 AM
JEFFREY D. KYLE
CLERK

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/28/2015 8:22:12 AM
JEFFREY D. KYLE
Clerk

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANT'S BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy, Attorney General for Civil
Litigation

DAVID A. TALBOT, JR
Chief, Administrative Law Division

April 27, 2015

ELLEN M. SAMETH
Assistant Attorney General
State Bar No. 17555550
ADMINISTRATIVE LAW DIVISION
OFFICE OF THE TEXAS ATTORNEY GENERAL
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1838
Facsimile: (512) 457-4608
E-mail: ellen.sameth@texasattorneygeneral.gov

*Attorney for Appellant, State Board for
Educator Certification*

# IDENTITIES OF PARTIES AND COUNSEL

PARTIES TO THE TRIAL COURT'S ORDER:

*Plaintiff/Appellant*:     State Board for Educator Certification and Michael Berry, the Acting Chief Executive Officer of the State Board for Educator Certification, in his Official Capacity Only[1]

*Defendant/Appellee*:     Erasmo Montalvo

**COUNSEL**:

*For Appellant, State Board for Educator Certification:*

> Ellen M. Sameth
> Assistant Attorney General
> State Bar No. 17555550
> OFFICE OF THE TEXAS ATTORNEY GENERAL
> ADMINISTRATIVE LAW DIVISION
> P.O. Box 12548
> Austin, TX  78711-2548
> Telephone: (512) 936-1838
> Facsimile:  (512) 457-4608
> Email: ellen.sameth@texasattorneygeneral.gov

*For Appellee, Erasmo Montalvo*:

> Mark W.  Robinett
> State Bar No. 17083600
> BRIM, ARNETT, ROBINETT,
> CONNERS & MCCORMICK, P.C.
> 2525 Wallingwood Drive, Bldg. 14
> Austin, Texas 78746
> Telephone:  (512) 328-0048, x110
> Facsimile:  (512) 328-4814
> E-mail: mrobinett@brimarnett.com

---

[1] Michael Berry was released as a Defendant by Agreed Order dated March 28, 2013. *See* App. C.

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL ........................................................ ii

TABLE OF CONTENTS .................................................................................. iii

INDEX OF AUTHORITIES ............................................................................... v

STATEMENT OF THE CASE ........................................................................ viii

REQUEST FOR ORAL ARGUMENT .................................................................. x

ISSUES PRESENTED ...................................................................................... xi

STATEMENT OF FACTS ................................................................................ xii

SUMMARY OF THE ARGUMENT ..................................................................... 2

ARGUMENT & AUTHORITIES ........................................................................ 3

ISSUE I. ......................................................................................................... 4

    The trial court erred in failing to find substantial evidence in the administrative record to support the Board's Final Decision and Order. .......... 4

        A. The Board has authority to issue sanctions without Code of Ethics violations. .................................................................................. 4

        B. The ALJ misinterpreted and misapplied the standard of "unworthy to instruct." ....................................................................................... 5

            1. The Board requires conduct to support a sanction, it does not require Code of Ethics violations. ....................................... 5

ISSUE II. ....................................................................................................... 8

    The Board properly amended the Proposal for Decision in Compliance with the Administrative Procedure Act. ...................................................... 8

        A. The Board properly amended the Proposal for Decision to comport with the findings of fact. .............................................................. 8

            1. The ALJ's analysis supports finding poor judgment by Montalvo. ...................................................................... 9

            2. The Board's Order is not arbitrary or capricious. ................ 10

            3. The Board's interpretation of its rules is to be given deference. .......................................................................... 12

            4. The Board properly used the findings of fact to conclude that Montalvo is unworthy to instruct. ...................................... 13

ISSUE III............................................................................................................16

    The Board's standard of "unworthy to instruct" is not unconstitutionally vague ................................................................................................................16

        A. The meaning and history of "unworthy to instruct.".....................16

            1. The "unworthy to instruct" language has been a part of educator parlance since at least 1925...................................16

            2. The "unworthy to instruct" standard, and analogous standards, have been upheld in case law. ...........................18

        B. "Unworthy to instruct" applies to Montalvo despite the lack of other disciplinary violations........................................................22

ISSUE IV. ........................................................................................................24

    The trial court abused its discretion in issuing a permanent injunction. .......24

CONCLUSION ................................................................................................25

PRAYER ..........................................................................................................26

CERTIFICATE OF COMPLIANCE................................................................27

CERTIFICATE OF SERVICE ........................................................................28

# INDEX OF AUTHORITIES

**Cases**

*Bexar Metro. Water Dist. v. Tex. Comm'n on Envtl. Quality*,
   185 S.W.3d 546 (Tex. App.—Austin 2006, pet. denied) .............................. 12, 13

*Brantley v. Tex. Alcoholic Beverage Comm'n.*,
   1 S.W.3d 343 (Tex. App—Texarkana 1999, no pet.) ............................................3

*Dodd v. Meno*,
   870 S.W.2d 4 (Tex. 1994) ................................................................................12

*Gerst v. Nixon*,
   411 S.W.2d 350 (Tex. 1966) ..............................................................................3

*Gomez v. Tex. Educ. Agency*,
   354 S.W.3d 905 (Tex. App.–Austin 2011, pet. denied) .....................................11

*In re Gamble*,
   71 S.W.3d 313 (Tex. 2002 ...............................................................................24

*In re State Bd. for Educator Certification*,
   No. 13-0537, 2014 Tex. LEXIS 1208; (Tex. December 19, 2014).... ix, 14, 15, 24

*In re State Bd. of Educator Certification*,
   411 S.W.3d 576 (Tex. App.—Austin 2013, orig. proceeding) ..................... ix, viii

*Jordan v. State Bd. of Ins.*,
   334 S.W. 2d 278 (Tex. 1960) ..................................................................... 20, 21

*Key Western Life Ins. Co. v. State Board of Insurance*,
   350 S.W.2d 839 (1961) .....................................................................................20

*Marrs v. Matthews,*
   270 S.W. 586 (Tex. Civ. App.—Texarkana 1925, writ ref'd) ..................... passim

*Martinez v. Tex. State Bd. of Med. Exam'rs*,
   476 S.W.2d 400 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.) .............20

*McHaney v. Tex. Comm'n on Envtl. Quality*,
2015 Tex. App. LEXIS 1903 (Tex. App.— Austin Feb. 27, 2015, no pet.)
(mem.op.)................................................................................3, 24

*R.R. Comm'n v. Torch Operating Co.*,
912 S.W.2d 790 (Tex. 1995) ...........................................................4

*Rodriguez v. Serv. Lloyds Ins*. Co.,
997 S.W.2d 248 (Tex. 1999) .................................................... 12, 13

*State Bd. for Educator Certification v. Montalvo*,
No. 03-12-00723-CV, 2013 Tex. App. LEXIS 4389 (Tex. App.—Austin April 3,
2013, no pet.) (mem. op.) ...................................................... viii

*Storey v. Cent. Hide & Rendering Co.*,
226 S.W.2d 615 (Tex. 1950) ............................................................24

*Tex. Alcoholic Beverage Comm'n. v. Sanchez*,
96 S.W.3d 483 (Tex. App.—Austin 2002, no pet.)..............................3

*Tex. Alcoholic Beverage Comm'n. v. Sierra*,
784 S.W.2d 359 (Tex. 1990) .............................................................3

*Tex. Health Facilities Comm'n v. Charter Med.–Dall., Inc.*,
665 S.W.2d 446 (Tex. 1984) .............................................................3

*Tex. State Bd. of Dental Exam'rs v. Sizemore*,
759 S.W.2d 114 (Tex. 1988) .........................................................3, 4

*TGS NOPEC Geophysical Co. v. Combs*,
340 S.W.3d 432 (Tex. 2011) ...........................................................11

*Triantaphyllis v. Gamble*,
93 S.W.3d 398 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ................24

*Vista Healthcare, Inc. v. Tex. Mut. Ins. Co.*,
324 S.W.3d 264 (Tex. App.—Austin 2010, pet. denied)....................................20

*Zimmer US, Inc., v. Combs*,
368 S.W.3d 579 (Tex. App.—Austin 2012, no pet.)............................................13

## Statutes

### Tex. Educ. Code

§ 13.046 ................................................................................................. 18
§ 13.046(a)(2) .........................................................................................18
§ 21.035 ................................................................................................. xi
§ 21.041(7), (8); 19..................................................................................5
§§ 21.031(a), .041(b)(1)(7)(8) .................................................................23
§§ 21.031(a); 21.041(b)(1)(7)...................................................................4
§ 21.041(7) (West 2012)...........................................................................3

### Tex. Gov't Code

§ 2001.058(e)...........................................................................................9
§ 2001.058(e)(1) ................................................................................9, 26
§ 2001.175(e)...........................................................................................4

## Other Authorities

74th Leg., R.S. ch. 260, § 58(1), 2003 Tex. Gen. Laws 2498...............................18

SBEC Disciplinary Policy ...................................................................... 21, 25

Tex. Rev. Civ. Statutes 1911, art.  2884 [2814] ....................................................18

Tex. Rev. Civ. Statutes art. 2814....................................................................5

## Rules

### 19 Tex. Admin. Code

§ 247 ......................................................................................................7
§ 249 ......................................................................................................7
§ 249.15 ................................................................................................17
§ 249.15(a), (b)(3) ...................................................................................5
§ 249.15(b)(2)....................................................................... xi, 2, 5, 17, 22
§ 249.3(45).............................................................................................17
§ 249.5 ..............................................................................................4, 21
§§ 249.15(a)(4) .....................................................................................17
§§ 249.3(59)............................................................................................2

**STATEMENT OF THE CASE**

*Trial Court Disposition*: The trial court issued a Judgment reversing the Board's Final Decision and Order and issuing a permanent injunction against the Board. CR[2] 3, or *see* App. A.

*Trial Court*: 200th District Court, Travis County, Texas, before the Honorable Tim Sulak.

*Course of Proceedings*: The Board issued a Final Decision and Order on August 10, 2012. 1 AR 67, or *see* App. B.

A timely motion for rehearing was filed and overruled by operation of law.

On September 25, 2012, Montalvo filed an Original Petition for Temporary Restraining Order, Temporary Injunction and Permanent Injunction. The trial court issued both a temporary restraining order and temporary injunction. Following the filing of an interlocutory appeal, this Court reversed and dissolved the temporary injunction for lack of a trial setting in the order. *State Bd. for Educator Certification v. Montalvo*, No. 03-12-00723-CV, 2013 Tex. App. LEXIS 4389 (Tex. App.—Austin April 3, 2013, no pet.) (mem. op.).

On March 28, 2013, the trial court issued an Agreed Order Dismissing Michael Berry as a defendant. *See* App. C.

On April 29, 2013, the trial court issued its Judgment reversing the Board's Order and issuing

---

[2] "CR" refers to the Clerk's Record. The number following refers to the page number. "AR" refers to the Administrative Record as this matter involved administrative proceedings at the agency level. The Administrative Record consists of nine volumes. The Administrative Record will be cited as, e.g., 2 AR *, where "2" refers to the volume and "*" represents a page number within the given volume. "FOF" and "COL" refer to findings of fact and conclusions of law, respectively.

a permanent injunction (effective until a ruling on this appeal) against the Board, prohibiting it from treating Montalvo's educator certificate as revoked, revoking his certificate, or superseding the court's Judgment following payment of a bond by Montalvo, should the Board appeal.

The Board filed a Petition for Writ of Mandamus and a Motion for Temporary Relief, both of which the Third Court of Appeals denied. *In re State Bd. of Educator Certification*, 411 S.W.3d 576 (Tex. App.—Austin 2013, orig. proceeding).

The instant appeal was abated while the Board sought relief in the Texas Supreme Court by filing a Petition for Writ of Mandamus. The Supreme Court denied relief. *In re State Bd. for Educator Certification*, No. 13-0537, 2014 Tex. LEXIS 1208, (Tex. Dec. 19, 2014).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 75, Texas Rules of Appellate Procedure, Appellant, State Board for Educator Certification, requests oral argument in this case. Because the issues involved concern the Board's interpretation and application of a principle central to its authority to regulate educators, the Board believes that oral argument will assist the Court in its analysis and resolution of this case.

# ISSUES PRESENTED

## ISSUE I.

**The trial court erred in failing to find substantial evidence in the administrative record to support the Board's Final Decision and Order.**

## ISSUE II.

**The Board properly amended the Proposal for Decision in compliance with the Administrative Procedure Act.**

## ISSUE III.

**The Board's standard of "unworthy to instruct" is not unconstitutionally vague.**

## ISSUE IV.

**The trial court abused its discretion in issuing a permanent injunction.**

## STATEMENT OF FACTS

Erasmo Montalvo, Appellee, holds an educator certificate. Montalvo was employed as a middle school teacher and served as a track and field coach at the high school in the Rio Grande City Consolidated Independent School District at the time the disciplinary case against him arose. 1 AR 62 (FOF #5), or *see* App. D. VS was a female senior high school student, under the age of 18, and an athlete on the track team, coached by Montalvo. 1 AR 62 (FOF #6). The Texas Education Agency (TEA), as the administrative arm of the Board, (*see* Tex. Educ. Code § 21.035,[3]) opened a disciplinary complaint against Montalvo, and filed its Original Petition with the State Office of Administrative Hearings on August 2, 2011. In its Original Petition, TEA alleged that Montalvo is unworthy to instruct or supervise the youth of this State (hereinafter "unworthy to instruct"), as well as four violations of the Educators' Code of Ethics. 2 AR 75. Being "unworthy to instruct" is not a Code of Ethics violation but is a separate finding that the Board may make against an educator regardless of whether there are violations of the Code of Ethics. Upon finding that an educator is unworthy to instruct, the Board has authority to sanction the educator's certificate, as it did in Montalvo's case. *See* 1 AR 67; 19 Tex. Admin. Code § 249.15(b)(2), attached and incorporated herein as App. E.

---

[3] All references to statutes and rules refer to those in effect at the time of the conduct made the basis of the underlying administrative proceeding.

Montalvo's specific conduct alleged by TEA includes: allowing VS, both alone and with other students, to use the Jacuzzi in the master bath of his home; asking VS lie on the bed in his master bedroom so he could massage her injured leg; engaging in sexual relations with VS on school property; exchanging over 400 phone calls with VS, including many late at night; and, engaging in inappropriate sexual contact with VS. 2 AR 73–75. In October of 2009, after hearing from VS what had occurred, her college counselor filed a complaint with the Starr County District Attorney's Office, which indicted Montalvo. Following a trial for sexual assault, Montalvo was acquitted. I AR 64 (FOF #33), or *see* App. D. Between the time that the criminal complaint was filed and the time that Montalvo was found not guilty, he was on paid administrative leave with the school district. 1 AR 43. Following the verdict Montalvo was allowed to resume his duties with the school district. 1AR 43.

The Administrative Law Judge found that Montalvo had not committed any of the alleged Code of Ethics violations, was not unworthy to instruct, and that the Board was not authorized to sanction him. 1 AR 64 (COL #6–8), or *see* App. D.

The Board issued its Final Decision and Order on August 10, 2012, revoking Montalvo's educator certificate. 1 AR 68, or *see* App. B. In doing so, the Board

adopted all thirty-three Findings of Fact in the PFD[4] without change. Of the eight Conclusions of Law, the Board modified two, and added a ninth.

Montalvo sought injunctive relief and judicial review of the Board's Final Decision and Order. On September 25, 2012, the trial court issued an *ex parte* Temporary Restraining Order and, on October 9, 2012, following a hearing, a Temporary Injunction. CR 96, 113.

The temporary injunction was overturned following an interlocutory appeal by the Board, because the injunction was lacking a date for a trial on the merits. After the trial on the merits, the trial court reversed the Board's Final Decision and Order, and issued a permanent injunction barring the Board from treating Montalvo's educator certificate as having been revoked. *See* App. A. The injunction is to remain in effect pending the appellate court's ruling on the Board's appeal.

---

[4] Proposal for Decision issued by an Administrative Law Judge following a contested hearing before the State Office of Administrative Hearings (SOAH).

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANT'S BRIEF

TO THE HONORABLE THIRD COURT OF APPEALS:

The trial court erred in reversing Appellant State Board for Educator

Certification's (Board) Final Decision and Order, which revoked Appellee Erasmo

Montalvo's (Montalvo) educator certificate after finding that it is not supported by

substantial evidence, and is arbitrary and capricious. Further, the trial court erred in

issuing a permanent injunction without balancing the equities. Accordingly, this

1

Court should reverse the Judgment of the trial court, and affirm the Board's Final Decision and Order.

## SUMMARY OF THE ARGUMENT

There is substantial evidence in the record to support the Board's Final Decision and Order, which found that Montalvo is unworthy to instruct. In its pleadings before SOAH, the Board alleged that Montalvo is not only unworthy to instruct, but also violated four standards contained in the Educators' Code of Ethics, as well as other standards contained in the Board's rules. 2 AR 75; *see* 19 Tex. Admin. Code chs. 247, 249. The ALJ did not find rule violations, or that Montalvo is unworthy to instruct. 1 AR 64 (COL #6–7), or *see* App. D. The Board adopted the ALJ's findings of fact *without changes*. 1 AR 67. The Board further determined that, based solely on Montalvo's *conduct as found by the ALJ* in FOF #11, 14, 18, 20, 22, 23, and 26, and Board standards, policies, and prior decisions, Montalvo is unworthy to instruct or supervise the youth of this state. 1 AR 68, or *see* App. A; 1 AR 62–63 or *see* App. D The Board has authority to find an educator unworthy to instruct based on conduct. 19 Tex. Admin. Code §§ 249.3(59), .15(b)(2), or *see* Apps. E, F.

Furthermore, the "unworthy to instruct" standard is not unconstitutionally vague so as to deprive Montalvo of due process, and has passed muster with Texas

appellate courts. *Marrs v. Matthews,* 270 S.W. 586, 589 (Tex. Civ. App.—Texarkana 1925, writ ref'd).

## ARGUMENT & AUTHORITIES

## STANDARD OF REVIEW

Review of disciplinary decisions of the Board proceeds under the APA and the standard of review is that of substantial evidence. Tex. Educ. Code § 21.041(7) (West 2012). Under that standard the question for the reviewing court is the reasonableness of the Board's Order, not its correctness. *Tex. Health Facilities Comm'n v. Charter Med.–Dall., Inc.*, 665 S.W.2d 446, 452–453 (Tex. 1984); *Tex. Alcoholic Beverage Comm'n. v. Sierra*, 784 S.W.2d 359, 360 (Tex. 1990); *Brantley v. Tex. Alcoholic Beverage Comm'n*. 1 S.W.3d 343, 347 (Tex. App—Texarkana 1999, no pet.); *Tex. Alcoholic Beverage Comm'n. v. Sanchez*, 96 S.W.3d 483, 489 (Tex. App.—Austin 2002, no pet.). The reviewing court cannot substitute its own judgment for that of the Board. *Tex. State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988). "The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Charter Med.-Dall., Inc.*, 665 S.W.2d at 452 (citing *Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966)); *McHaney v. Tex. Comm'n on Envtl. Quality*, 2015 Tex. App. LEXIS 1903 (Tex. App.—Austin Feb. 27, 2015, no pet.) (mem.op.) ("We must sustain the agency's action if

3

it is supported by substantial evidence, meaning that the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action."). Further, the administrative order is given deference because of the agency's expertise with the subject matter. *R.R. Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995).

In applying the substantial evidence standard, there is a presumption that the agency's order is supported by substantial evidence in the record, and the burden is on the one challenging that order to show that it is not. *Sizemore*, 759 S.W.2d at 116. Review is restricted to the administrative record. Tex. Gov't Code § 2001.175(e).

## ISSUE I.

### The trial court erred in failing to find substantial evidence in the administrative record to support the Board's Final Decision and Order.

**A.** **The Board has authority to issue sanctions without Code of Ethics violations.**

One of the most basic functions of the Board is to regulate educator conduct and issue sanctions. Tex. Educ. Code §§ 21.031(a); 21.041(b)(1)(7); 19 Tex. Admin. Code § 249.5, or *see* App. I. The Board has promulgated a Code of Ethics, the violation of which may result in a sanction ranging from a non-inscribed (private) reprimand to permanent revocation of the individual's educator

4

certificate. Tex. Educ. Code § 21.041(7), (8); 19 Tex. Admin. Code, Ch. 247, § 249.15(a), (b)(3).

But, importantly, aside from the Code of Ethics, an educator is subject to being sanctioned if found "unworthy to instruct." 19 Tex. Admin. Code § 249.15(b)(2), *see* App. E. As early as 1911, Tex. Rev. Civ. Statutes, art. 2882 [2814] made reference to the authority of the then-State Superintendent of Public Instruction to cancel a certificate "upon satisfactory evidence that the holder thereof "[ . . . ] is a person unworthy to instruct the youth of this State[.]" See App. G.; *Marrs,* 270 S.W. at 588. The *Marrs* case (discussed in more detail in section B, below) is squarely on point as it involves an appeal based on the vagueness and uncertainty of the term "unworthy," as used in Tex. Rev. Civ. Statutes art. 2814, in effect at that time. *See* App. G, attached; *Marrs*, 270 S.W. 586, 588.

By choosing to become part of any regulated profession, the license holder is consciously and voluntarily making a choice to abide by the rules of that profession.

**B.** **The ALJ misinterpreted and misapplied the standard of "unworthy to instruct."**

**1. The Board requires conduct to support a sanction, it does not require Code of Ethics violations.**

The Board's complaint alleged that Montalvo's conduct indicates that he is a person unworthy to instruct, and that he violated various disciplinary rules of the

5

Board.  2 AR 75.  The ALJ found that none of the alleged violations were substantiated.  1 AR 63–64 (FOF # 16, 21, 24, 25, 28–30, and COL #6–7), or *see* App. D.  To the contrary, the Findings of Fact support the Board's action of revoking Montalvo's certificate because he is unworthy to instruct, including:

FOF #11    District protocol required that injured students he sent to the trainer.  (1 AR 62);

FOF #14    VS did not visit the trainer about her injury.  (1 AR 62);

FOF #18:    Following her injury, VS underwent stretching, rub downs, ice baths, and whirlpool use under Mr. Montalvo's direction.  (1 AR 63);

FOF #20:    Mr. Montalvo gave VS, and other students, rub downs.  (1 AR 63);

FOF #22:    On two or three occasions, student athletes visited Mr. Montalvo's home to use his Jacuzzi in the master bath.  The athletes wore sports bras or bathing suit tops, and brief "bikers" shorts.  (1 AR 63);

FOF #23:    On one occasion, VS went alone to Mr. Montalvo's house to use the Jacuzzi.  (1 AR 63);

FOF #26:    From February through June 2008, Mr. Montalvo engaged in approximately 480 phone calls with Student 1,[5] with over 80 of the calls placed after 10:00 p.m.  (1 AR 63).

---

[5] Student 1 and VS are the same person.

6

Montalvo *did not challenge these findings*. It is clear that there is substantial evidence in the record for the Board to find that Montalvo is unworthy to instruct *based on his conduct*, even though the ALJ failed to find a basis upon which the Board could sanction Montalvo. There is testimony in the record attesting to the fact that allowing students to come to your home to use the Jacuzzi in the master bathroom is inappropriate and "unethical" (testimony of James Meguire, Head Athletic Trainer at Rio Grande City High School, 4 AR 275, TR 295:21–296:5), and that it is inappropriate (testimony of Rey Ramirez, Athletic Director at the Rio Grande ISD, 4 AR 261, TR 241:13–18). There is also testimony that engaging in over 400 telephone calls with a student in a four month period is a "little excessive" and inappropriate (testimony of Rey Ramirez, 4 AR 261 TR 241:23–242:2).

What the ALJ failed to grasp is that Montalvo's conduct, as found by FOF #11, #14, #18, #20, #22–23, and #26, speaks for itself in terms of demonstrating a serious lack of judgment. These seven findings of fact indicate Montalvo's conduct – he did not object to any of them. It is that lack of judgment, leading to Montalvo's inappropriate and unacceptable behavior as an educator, which indicates his unworthiness to instruct; violations of the Code of Ethics are unnecessary.

## ISSUE II.

## The Board properly amended the Proposal for Decision in Compliance with the Administrative Procedure Act.

### A. The Board properly amended the Proposal for Decision to comport with the findings of fact.

The Board adopted, verbatim, all Findings of Fact and the first six of the eight Conclusions of Law, modifying two, and adding one. The two Conclusions of Law, as found by the ALJ, that are in issue are:

> 7. The foregoing Findings of Fact do not support a conclusion that Mr. Montalvo is a person unworthy to instruct or supervise the youth of this state.
>
> 8. SBEC is not authorized to take disciplinary action against Respondent's Texas Educator Certificate.

I AR 64. The Board modified those conclusions, and added a ninth one in its Final Decision and Order:

> 7. Based on Findings of Fact 11, 14, 18, 20, 22, 23 and 26, Respondent exceeded the bounds of the proper educator–student relationship and is a person unworthy to instruct or supervise the youth of this state.
>
> 8. SBEC is authorized to take disciplinary action against Respondent's Texas Educator Certificate.
>
> 9. Respondent's educator certificate should be sanctioned.

8

Based on Montalvo's conduct as found in the Findings of Fact, there is nothing arbitrary or capricious about the Board's Final Decision and Order. It is reasonable, given the Findings of Fact, for a state licensing board charged with regulating educator conduct in an effort to ensure the safety of schoolchildren, to find that Montalvo's judgment and subsequent actions placed those children at risk.

Further, the changes were made by the Board in compliance with Tex. Gov't Code § 2001.058(e); they are supported by substantial evidence in the record (as noted by the references to the specific findings of fact relied upon); were made, as permitted under Tex. Gov't Code section 2001.058(e)(1), because the ALJ misinterpreted and misapplied the Board's rule regarding "unworthy to instruct;" and were explained in the Board's Final Decision and Order, tying the findings to the Board's philosophy and perspective. I AR 67–69, or *see* Appendix B.

### 1. The ALJ's analysis supports finding poor judgment by Montalvo.

In her analysis of the evidence, the ALJ noted the following:

> "A coach's talking to a student by telephone 480 times over five months is certainly a matter to trigger concern." I AR 59 (App. D);

> "Mr. Montalvo unquestionably exercised bad judgment in opening his master bath to students, and especially to one female student alone—even if Mr. Montalvo's wife was at home at the time." 1 AR 61 (App. D).

Thus, the ALJ found at least two of Montalvo's decisions to be of questionable judgment and a cause for concern despite the conclusion in the PFD that the Board has no basis upon which to sanction his certificate. Based on the totality of Montalvo's questionable actions, the Board, as the final arbiter of the sanction, properly determined that Montalvo is unworthy to instruct or supervise.

The *Marrs* decision is instructive, because it speaks to educator "qualities." *See Marrs*, 270 S.W. at 588. In fact, what the *Marrs* Court opines is that there are "many characteristics which may and should be considered in passing upon the issue of unworthiness in a teacher" and that they are too many and varied to enumerate. *Id.* at 588. The judgment of an educator is integral to that educator's worthiness, or unworthiness, to instruct or supervise the youth of this state.

## 2. The Board's Order is not arbitrary or capricious.

As shown by both the Findings of Fact and the concerns found by the ALJ in her analysis of Montalvo's conduct, there is clearly a basis for reasonable minds to come to the same conclusion that the Board came to, that is, to find that Montalvo is unworthy to instruct. The Board, as was the ALJ, is concerned about Montalvo's judgment and behavior but, unlike the ALJ, the Board also correctly interpreted and applied the Findings of Fact to find that Montalvo is unworthy to instruct.

10

Reiterating the standard involved in a substantial evidence appeal, the question is not the correctness of the agency's order, but its reasonableness. To be "arbitrary and capricious," there must be a lack of guiding principles:

> When there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, we generally defer to the agency's interpretation unless it is "plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). But this deference to the Board's interpretation is not conclusive or unlimited—we defer only to the extent that the Board's interpretation is reasonable.

*Gomez v. Tex. Educ. Agency*, 354 S.W.3d 905, 912 (Tex. App.–Austin 2011, pet. denied). The Board's "unworthy to instruct" determination is rationally related to Montalvo's conduct; even the ALJ expressed concern about that conduct in her analysis of the evidence. It is reasonable for the Board to be concerned about Montalvo allowing students to use the Jacuzzi in his master bath, including on one occasion VS, a female under the age of 18, alone. It is equally reasonable for the Board to be concerned about hundreds of phone calls having taken place during a four–month period between VS and Montalvo. Those facts are just two of the many taken into account when the Board found Montalvo to be unworthy to instruct. Moreover, Montalvo did not appeal any of the findings of fact in his suit for judicial review. Montalvo's conduct goes beyond the fact that he did not

11

violate the Code of Ethics; what matters is that the inappropriate conduct itself occurred.

### 3. The Board's interpretation of its rules is to be given deference.

The "unworthy to instruct" standard is broader than Code of Ethics or other standards. As a result, whether or not Montalvo violated the Board's rules is not dispositive of whether or not he is "unworthy to instruct." The ALJ's conclusion that the Board cannot sanction Montalvo's certificate is an incorrect interpretation of the Board's rules, philosophy, and Disciplinary Policy. The Board has expertise and a central role in protecting the welfare of schoolchildren and educators. Because of that, Board's conclusion finding Montalvo lacking in the judgment necessary to be a role model for students and to protect them, must be given deference.

The Board's interpretation of its statutes and rules is to be given "serious consideration, as long as the construction is reasonable and does not contradict the plain language of the statute." *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994); *Bexar Metro. Water Dist. v. Tex. Comm'n on Envtl. Quality*, 185 S.W.3d 546, 550 (Tex. App.—Austin 2006, pet. denied) ("We give great weight to the agency's interpretation of its own rules and regulations, although such interpretation is not binding on this Court."). Administrative rules are ordinarily construed in the same manner as statutes. *Rodriguez v. Serv. Lloyds Ins*. Co., 997 S.W.2d 248, 254 (Tex.

12

1999).  "Unless a rule is ambiguous, we follow the rule's clear language; *when there is vagueness, ambiguity, or room for policy determinations in a rule, we defer to the agency's interpretation unless it is plainly inconsistent with the language of the rule*."  (Emphasis added).  *Zimmer US, Inc., v. Combs*, 368 S.W.3d 579, 583 (Tex. App.—Austin 2012, no pet.).  Further, agencies "must be afforded sufficient flexibility to determine and carry out [their] clear legislative mandate." *Bexar Metro.*, 185 S.W. 3d at 551.

There is nothing inconsistent or unreasonable about the Board's interpretation of the "unworthy to instruct" language.  To force the Board to wait for a proven injury to a student is asking it to abandon its duty to protect schoolchildren.  Because Montalvo's judgment and behaviors as an educator are questionable, the Board's determination that Montalvo is unworthy to instruct should be accorded deference and upheld upon the evidence contained in the record.  The fact that the ALJ concluded that no ethical standards were violated and that Montalvo is not unworthy to instruct is irrelevant to the Board's determination, based on the facts recited in the PFD, that Montalvo is unworthy to instruct.

**4. The Board properly used the findings of fact to conclude that Montalvo is unworthy to instruct.**

It is clear from the discussion of the evidence in the PFD that the ALJ analyzed each piece of evidence in terms of whether or not it demonstrated a

13

violation of a particular rule or standard, and if it indicated that Montalvo is unworthy to instruct. But from the Board's perspective, unworthiness to instruct is not necessarily based on individual findings indicating poor judgment or ethical violations but, rather, on the totality of findings. The fact that the ALJ found at least two categories of behavior by Montalvo (excessive phone calls, and allowing students to use the Jacuzzi in his master bath at home) to be questionable but not indicative of Montalvo's being unworthy to instruct, is not the end of the analysis.

In her concurring opinion in *In re State Bd. for Educator Certification,* No. 13-0537, 2014 Tex. LEXIS 1208 (Tex. December 19, 2014), Justice Guzman wrote:

> I also write separately today because I believe the record before us fails to affirmatively indicate that the trial court considered the potentially significant harm to schoolchildren before effectively reinstating Erasmo Montalvo's educator certificate pending the outcome of the appeal.

2014 Tex. LEXIS 1208 at *20. Justice Guzman further opined:

> But of at least equal import is the interest of schoolchildren in not being exposed to the harm of interaction with a *teacher who fails to understand the proper bounds of the student-teacher relationship*. The record before us reflects the trial court gave only cursory (if any) consideration to the safety and welfare of Texas students, declaring only that "[t]he competing equities favor granting the injunction." But evidence undisputedly indicates that Montalvo, a high school track and field coach and an elementary school physical education coach, allowed a teenage female student—wearing only a

14

sports bra and biker shorts—to use the Jacuzzi in the master bathroom of his home while no one else was present, called that female student over 480 times over a four-month period (with over 80 calls occurring after 10:00 p.m.), gave several female athletes "rubdowns" and ice baths, and failed to follow district protocol to send an injured athlete to the trainer. *The State Board for Educator Certification determined these actions exceeded the bounds of the proper educator-student relationship and violated the trusted position of authority afforded to Texas school teachers. Allowing Montalvo to continue teaching after willingly exceeding the bounds of the proper student-teacher relationship could substantially harm the safety and welfare of Texas schoolchildren.*

*Id.* at *23–24 (emphasis added). While Justice Guzman was discussing the issuance by the trial court of its injunction against the Board while the case is on appeal, her observations clearly relate equally as well to the merits of this case and go to the heart of the "unworthy to instruct" issue.

The Board has experience, expertise, and a thorough understanding of what it means to find an educator to be unworthy to instruct. It is the Board's interpretation of the phrase, "unworthy to instruct," which dictates whether or not the pieces of evidence, as found by the ALJ, support such a finding. In this case, there are no specific Code of Ethics or other rule violations. And, while individual facts *may* not support a finding that Montalvo is unworthy to instruct, the Board has explained that it is *all of those findings together* that indicate to it, that Montalvo is unworthy to instruct. I AR 68–69, or *see* App. B. The Board's Final

15

Decision and Order cites to seven findings of fact – the findings that speak to Montalvo's conduct and that went unchallenged in the trial court – found by the ALJ that support its conclusion that Montalvo is unworthy to instruct.

In summary, the Board found that, based on the totality of circumstances, Montalvo exceeded the boundaries of an appropriate educator-student relationship, and is unworthy to instruct.

## ISSUE III.

### The Board's standard of "unworthy to instruct" is not unconstitutionally vague.

**A. The meaning and history of "unworthy to instruct."**

**1. The "unworthy to instruct" language has been a part of educator parlance since at least 1925.**

The standard of "unworthy to instruct" is not unconstitutionally vague or otherwise a violation of Montalvo's due process rights. The standard has a long history with educators, in both law and case law. In fact, other professions have analogous standards which have also been upheld.

The "unworthy to instruct" language appears in several places in the Board's rules. It is first referenced in § 249.3, the "Definitions" section relating to disciplinary proceedings:

> Unworthy to instruct or to supervise the youth of this state—the determination that a person is unfit to hold a certificate under the TEC, Chapter 21, Subchapter B,[6] or to be allowed on a school campus under the auspices of an educator preparation program.

19 Tex. Admin. Code § 249.3(45), or *see* App. F. The next reference is contained in § 249.15(b)(2):

> § 249.15. Disciplinary Action by State Board for Educator Certification
> (a) Pursuant to this chapter, the State Board for Educator Certification (SBEC) may take any of the following actions:
> . . .
>
> (4) *revoke* or cancel, which includes accepting the surrender of, a certificate without opportunity for reapplication for a set term or permanently; or
> . . .
>
> (b) The *SBEC* may take any of the actions listed in subsection (a) of this section *based on satisfactory evidence that:*
> . . .
>
>     (2) *the person is unworthy to instruct* or to supervise the youth of this state;

19 Tex. Admin. Code §§ 249.15(a)(4), (b)(2) (emphasis added), or *see* App. E.

Thus, § 249.15 expressly authorizes the Board to revoke an educator certificate based on being found "unworthy to instruct."

---

[6] Chapter 21, Subchapter B of the Texas Education Code is the chapter governing the certification of educators.

Section 13.046 of the Texas Education Code (now repealed), in noting when an educator certificate is subject to cancellation, referenced "unworthy to instruct":

> (a) *Any teacher's certificate* issued under the provisions of this code or under any previous statute relating to the certification of teachers *may be* suspended or *cancelled* by the state commissioner of education under any one or more of the following circumstances:
>
> . . .
>
> (2*) on satisfactory evidence that the holder is a person unworthy to instruct* the youth of this state; or

(emphasis added).  Tex. Educ. Code § 13.046(a)(2) (Repealed by Acts of May 30, 1995, 74th Leg., R.S. ch. 260, § 58(1), 2003 Tex. Gen. Laws 2498.  When the Board came into existence, in 1995, various statutes were repealed, including § 13.046, and others promulgated.  Even prior to § 13.046, reference can be found to the authority of the then-State Superintendent of Public Instruction to cancel a certificate "upon satisfactory evidence that the holder thereof "[ . . . ] is a person unworthy to instruct the youth of this State. Tex. Rev. Civ. Statutes 1911, art. 2884 [2814].  *See* App. G.

**2. The "unworthy to instruct," and analogous standards, have been upheld in case law.**

Case law in Texas referencing "unworthy to instruct" also goes back at least as far as 1925:

> The contention is that the term "unworthy," as used in article 2814, is too vague and uncertain to legally define a disqualification to further hold a teacher's certificate.

*Marrs*, 270 S.W. at 588. Thus, in addressing Montalvo's assertion that the standard of "unworthy to instruct" is vague and ambiguous, the *Marrs* case is directly on point. The Court opined:

> The word "unworthy," as used in common parlance, has a well-defined signification. As here used, it means the lack of "worth"; the absence of those moral and mental qualities which are required to enable one to render the service essential to the accomplishment of the object which the law has in view. *It may also include those positive traits of character which, notwithstanding excellent educational attainments, unfit one to impart proper instruction to the young.* To call one "unworthy" is to impute moral delinquency to a degree of unfitness for the work in hand. *There are many characteristics which may and should be considered in passing upon the issue of unworthiness in a teacher in the public schools. Different minds might reach different conclusions as to what qualities of character should render one unworthy to hold a certificate to teach. But there can be no difference of opinion about the fact that an unworthy person should not be permitted to teach in the public schools. What qualities, or lack of qualities, should render one unworthy would be difficult for legislative enumeration.* They are so numerous, and their combinations so varied in different individuals, that a statute which undertakes to be more specific would either be incomplete, or so inflexible as to defeat the ends sought. In the very nature of the subject there must be lodged somewhere a personal discretion for determining who are the "unworthy."

(Emphasis added). *Id.* Aside from its detailed explanation of "unworthy to instruct," this passage in *Marrs* makes it clear that it is impossible to legislate all circumstances in which one may be found unworthy to instruct. The *Marrs* case has not been overruled.

Other cases upholding language that is analogous to "unworthy to instruct" in that the language is not susceptible to exact definition and has been attacked as too vague and ambiguous to be upheld, include: *Jordan v. State Bd. of Ins.*, 334 S.W. 2d 278, 280 (Tex. 1960) ("Further the idea embodied within the phrase [unworthy of the public confidence] is reasonably clear and hence acceptable as a standard of measurement. And in this lies the true constitutional test."); *Martinez v. Tex. State Bd. of Med. Exam'rs*, 476 S.W.2d 400, 404 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.) ("The idea embodied within the phrase 'grossly unprofessional or dishonorable conduct of a character which in the opinion of the Board is likely to deceive or defraud the public' is reasonably clear."); *Key Western Life Ins. Co. v. State Board of Ins.*, 350 S.W.2d 839 (1961), (authorizing disapproval of a policy form if it "encourages misrepresentation"); *Vista Healthcare, Inc. v. Tex. Mut. Ins. Co.*, 324 S.W.3d 264, 274 (Tex. App.—Austin 2010, pet. denied) (" . . . no requirement here that every detail of what constitutes 'fair and reasonable' . . . be set out by rule to provide Vista with fair notice of the standards by which individual fee disputes will be adjudicated."). And, as in

*Marrs*, these opinions support the proposition that the fact situations to which civil statutes might apply are simply too numerous to legislate.

In *Jordan v. State Bd. of Ins.*, 334 S.W. 2d 278, 281 (Tex. 1960), the Texas Supreme Court includes in its opinion a list (citing to K. Davis, *Administrative Law Treatise*, § 2.03 (1st ed. 1958)) of various "general" phrases – i.e., the same genre as "unworthy to instruct" – which have passed muster with the United States Supreme Court;

> [T]he standards the Supreme Court [of the United States] has held adequate include 'just and reasonable,' 'public interest,' 'unreasonable obstruction' to navigation, 'reciprocally unequal and unreasonable,' 'public convenience, interest, or necessity,' 'tea of inferior quality,' 'unfair methods of competition,' 'reasonable variations,' 'unduly or unnecessarily complicate the structure' of a holding company system or 'unfairly or inequitably distribute voting power among security holders.'"

The *Jordan* case also specifically cites to *Marrs*. *See Jordan*, 334 S.W. 2d at 281.

As evidence of just how central the concept of "unworthy to instruct" and the *Marrs* case is to the Board and disciplinary actions, the Board cites to *Marrs* in its Disciplinary Policy. 7 AR 688–690, or *see* App. J. Portions of the Board's Disciplinary Policy are now stated in rule (although this was not the case until December 23, 2013), including its explanation of "unworthy to instruct." 19 Tex. Admin. Code 249.5.

**B.** **"Unworthy to instruct" applies to Montalvo despite the lack of other disciplinary violations.**

The allegation that Montalvo is "unworthy to instruct or supervise the youth of this state" stands as a separate basis for sanctioning an educator certificate and does not rely on a violation of the Code of Ethics. 19 Tex. Admin. Code § 249.15(b)(2); I AR 64 (COL #5). The ALJ's Findings of Fact, *adopted verbatim by the Board* in its Final Decision and Order, support a finding of "unworthy to instruct." Thus, for example, while the ALJ did not find any romantic underpinnings in the 480 phone calls over a four month period between Montalvo and VS and therefore no violations of the Code of Ethics, the Board took exception to the fact that there *were* 480 calls, determining that such an excessive number of calls crossed the bounds of an appropriate educator-student relationship. I AR 67–68. As another example, the fact that the ALJ failed to find that Montalvo had sexually abused or assaulted VS when she went alone to Montalvo's house to use the Jacuzzi did not sway the Board, which, instead, took exception to the fact that Montalvo *allowed* VS come to his home alone to use the Jacuzzi in his master bathroom. 1 AR 67–68. The Board found that this conduct makes Montalvo unworthy to instruct by "crossing the bounds of an appropriate student-teacher relationship." I AR 69, or *see* App. B

There is no doubt that allowing VS, a female high school student, into his master bathroom to use the Jacuzzi, illustrates a lack of judgment on Montalvo's

part. Additionally, the occurrence of 480 telephone calls during a four-month period, with over 80 of them taking place after 10:00 p.m., further illustrates Montalvo's lack of judgment.

Montalvo's conduct, as found by the ALJ's Findings of Fact, exceeds the bounds of a proper educator–student relationship. The Board relied on those findings illustrating his conduct to find Montalvo unworthy to instruct.

Ultimately, whether or not improper conduct—beyond the ALJ's Findings of Fact—took place is not the issue. Thus, it does not matter whether the content of the phone calls was romantic in nature. Stated another way, it is immaterial whether the content of the phone calls implicated a Code of Ethics violation for the Board to find that the conduct exceeded the bounds of an appropriate student-teacher relationship and thus at least implicates the standard of "unworthy to instruct." Instead, the ultimate issue *for the Board* is the fact that Montalvo engaged in these behaviors. That conduct alone demonstrates how Montalvo fails to meet the expectations of the Board in protecting the welfare of students and educators.

The legislature has given broad authority to the Board to carry out its functions. Tex. Educ. Code §§ 21.031(a), .041(b)(1)(7)(8). The Board determined that Montalvo's judgment and behavior speaks louder than whether or not specific standards in the Code of Ethics were violated. Reasonable minds could certainly

reach the same conclusion as the Board concerning Montalvo's judgment. "The substantial-evidence standard does not require 'a large or considerable amount of evidence'—in fact, the evidence may even preponderate against the agency's finding—but requires only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact.'" *McHaney*, 2015 Tex. App. LEXIS 1903 at *11.

## ISSUE IV.

**The trial court abused its discretion in issuing a permanent injunction.**

The trial court improperly issued a permanent injunction, prohibiting the Board from treating Montalvo's educator certificate as having been revoked. *See* App. A.

In issuing an injunction, the trial court must look not only at the elements needed to support issuance, but it must also balance the equities. *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 401–02 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Because an injunction is an equitable remedy, the equities on both sides must be taken into account prior to issuance. *In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002); *Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 618-19 (Tex. 1950). A failure to do so is an abuse of discretion, as here. *In re State Bd. for Educator Certification*, 2014 Tex. LEXIS 1208 at *20; *Triantaphyllis* 93 S.W.3d at 402.

24

As noted above in Justice Guzman's concurring opinion, the trial court failed to balance the equities prior to issuing its injunction and disallowing the Board from superseding its ruling on appeal. *See* App. H (Trial Court's Findings of Fact and Conclusions of Law). Instead, the trial court looked only at the effect on Montalvo if it did not grant his request for relief, and failed to look at the risk to schoolchildren in allowing Montalvo to remain an educator pending any appeal by the Board.

The trial court, in issuing an injunction against the Board without weighing the equities, has abused its discretion and allowed Montalvo to continue in his role as an educator, despite being found unworthy to instruct. As a result, the schoolchildren that the Board has a duty to protect, have been put at risk.

## CONCLUSION

The Court should reverse the trial court's Judgment, including the injunction, and affirm the Board's Final Decision and Order revoking Monalvo's educator certificate, for the following reasons:

1. The ALJ misinterpreted and misapplied the standard of "unworthy to instruct" as used in educator parlance;

2. There is substantial evidence in the record supporting the Board's finding that Montalvo, due to his judgment and conduct, is unworthy to instruct;

3. No violations of the Educators' Code of Ethics or other Board rules are necessary to support a finding of "unworthy to instruct;"

25

4. The Board's changes to the ALJ's Proposal for Decision comply with the requirements of the APA, § 2001.058(e)(1), because the changes were made based on legal reasons explained in its Final Decision and Order;

5. All changes to the Proposal for Decision are supported by substantial evidence; and

6. The issuance of a permanent injunction against the Board was an abuse of discretion.

## PRAYER

Appellant, State Board for Educator Certification, respectfully requests that this Court affirm the Board's Final Decision and Order in SOAH Docket No. 701–11–8468.EC in all respects and deny all relief sought by Appellee, Erasmo Montalvo. Appellant prays for such other and further relief to which it may be justly entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division

/s/ Ellen M. Sameth

ELLEN M. SAMETH
Assistant Attorney General
Texas State Bar No. 17555550
OFFICE OF THE TEXAS ATTORNEY GENERAL
ADMINISTRATIVE LAW DIVISION
P.O. Box 12548
Austin, Texas  78711-2548
Telephone: (512) 936-1838
Facsimile:  (512) 457-4608
E-mail: ellen.sameth@texasattorneygeneral.gov
ATTORNEYS FOR STATE BOARD FOR
EDUCATOR CERTIFICATION

## CERTIFICATE OF COMPLIANCE

I certify that this Appellant's Brief submitted complies with Tex. R. App. P. 9 and the word count of this document is 5,796.  The word processing software used to prepare this filing, and calculate the word count of the document, is Microsoft Word 2010.

Date: April 27, 2015

/s/ Ellen M. Sameth

Ellen M. Sameth
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record:

Mark W. Robinett                                    Via: *Electronic Service*
BRIM, ARNETT, ROBINETT,
CONNERS & MCCORMICK, P.C.
2525 Wallingwood Drive, Bldg. 14
Austin, Texas 78746
mrobinett@brimarnett.com


        /s/ Ellen M. Sameth
        Ellen M. Sameth
        Assistant Attorney General

CASE NO. 03-13-00370-CV

---

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

---

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

---

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

---

APPELLANTS' BRIEF

---

APPENDIX A

| | | |
|---|---|---|
| ERASMO MONTALVO, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| THE STATE BOARD FOR | § | |
| EDUCATOR CERTIFICATION, | § | |
| *Defendant.* | § | 200TH JUDICIAL DISTRICT |

## JUDGMENT

On the 21st day of March, 2013, the Court heard the merits of the above-entitled and numbered cause on the claim of judicial review brought by Plaintiff, Erasmo Montalvo, complaining of the administrative order of Defendant, State Board for Educator Certification, which was subject to substantial evidence review on the administrative record. Plaintiff's Original Petition included a request for injunctive relief, heard on April 25, 2013. Plaintiff Erasmo Montalvo appeared in person and by his attorneys of record, Mark Robinett and Corey Tanner, on both dates; Defendant State Board for Educator Certification appeared in person and by its attorney of record, Ellen Sameth, Assistant Attorney General, on both dates.

After considering all briefs, arguments, the administrative record and applicable rules and law, the Court finds that Defendant's Final Decision and Order in SOAH Docket No. 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.EC is not supported by substantial evidence and is arbitrary and capricious.

IT IS THEREFORE ORDERED that Defendant's Final Decision and Order is REVERSED.

The Court FURTHER FINDS, after considering the evidence adduced and argument of counsel during the April 25, 2013, hearing for injunctive relief, that Plaintiff, Erasmo Montalvo, is entitled to a permanent injunction prohibiting the State Board for Educator from treating as revoked or revoking the educator certificate of Plaintiff based on the facts and allegations made the basis of Defendant's complaint in SOAH Docket No. 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.EC, which injunction is to remain in effect until, in the case of any appeal taken by Defendant, a ruling from the appellate court issues.

IT IS FURTHER ORDERED, pursuant to Rule 24.2(a)(3) of the Texas Rules of Appellate Procedure, that any appeal taken of this Judgment by Defendant State Board for Educator Certification will not supersede this Judgment during the pendency of such appeal. Plaintiff is ORDERED to post security in the amount of $1,000.00 to secure the Defendant against any loss or damage caused by the relief granted Plaintiff if an appellate court determines, on final disposition, that relief was improper.

IT IS FURTHER ORDERED that all taxable costs of court be assessed against the party who incurred them.

IT IS FURTHER ORDERED that all remedies not specifically granted are herein denied.

Signed on the 29TH day of APRIL, 2013.

JUDGE TIM SULAK

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX B

SOAH DOCKET NO. 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.EC

| | | |
|---|---|---|
| TEXAS EDUCATION AGENCY, | § | BEFORE THE STATE OFFICE |
| EDUCATOR CERTIFICATION AND | § | |
| STANDARDS DIVISION, | § | |
|    Petitioner | § | |
| | § | |
| V. | § | OF |
| | § | |
| ERASMO MONTALVO, JR., | § | |
|    Respondent | § | ADMINISTRATIVE HEARINGS |

## FINAL DECISION AND ORDER

Came on for consideration on the 10th day of August 2012 the above-styled matter.

After proper notice was given, the above-styled case was heard by an Administrative Law Judge who made and filed a Proposal for Decision containing Findings of Fact and Conclusions of Law. This Proposal for Decision was properly served on all parties, who were given an opportunity to file exceptions and replies as part of the administrative record.

The State Board for Educator Certification, ("Board" or "SBEC"), after review and consideration of the Proposal for Decision, as well as the exceptions and replies filed, if any, adopts the Findings of Fact Nos. 1 through 33 and Conclusions of Law Nos. 1 through 6 in the Proposal for Decision, as if fully set out herein. The Board modifies and adopts Conclusions of Law Nos. 7 and 8, as set out below, and adds Conclusion of Law 9. All proposed Findings of Fact and Conclusions of Law not specifically adopted herein are hereby denied.

Respondent, a male coach, engaged in conduct which exceeds the bounds of the proper educator-student relationship during the spring semester of 2008 by failing to follow district protocol and send V.S. to the trainer for her ongoing injury, (Findings of Fact 11 and 14); by rubbing down and/or massaging V.S., (Findings of Fact 18 and 20); by treating V.S.'s injury himself with stretching, ice baths, and whirlpools, (Finding of Fact 18); by allowing V.S. to use the Jacuzzi in the master bedroom of his home while no one else was present, (Findings of Fact 22 and 23); and by engaging in approximately 480 phone calls with V.S. during a 4 month period, with over 80 of those calls being placed after 10:00 p.m. (Finding of Fact 26).

Conclusion of Law 7:

Based on Findings of Fact 11, 14, 18, 20, 22, 23 and 26, Respondent exceeded the bounds of the proper educator-student relationship and is a person unworthy to instruct or supervise the youth of this state.

Conclusion of Law 8:

SBEC is authorized to take disciplinary action against Respondent's Texas Educator Certificate.

Conclusion of Law 9:

Respondent's educator certificate should be sanctioned.

These additions and modifications are permissible pursuant to Texas Government Code § 2001.058(e) and are necessary because the Administrative Law Judge failed to appropriately interpret and apply SBEC policies and rules. *See* 34 TexReg 5421-22, *Marrs v. Matthews*, 270 S.W. 586 (1925), 19 Tex. Admin. Code § 249.15(b)(2).

Protecting the safety and welfare of Texas schoolchildren and school personnel is a primary purpose of the SBEC. A certified educator holds a unique position of public trust, and therefore, the conduct of an educator must be held to the highest standard.

The moral fitness of an educator must be determined from an examination of all relevant conduct and is not limited to conduct that constitutes a criminal violation or results in a criminal conviction. The responsibility and discretion to make this weighty determination is vested in the SBEC.

Mr. Montalvo held a trusted position of authority that provided him a unique opportunity to exploit vulnerable female athletes. Educators must clearly understand the boundaries of the educator-student relationship that they are trusted not to cross. The SBEC considers any violation of that trust to be conduct that may result in permanent revocation of an educator's certificate.

Allowing a female student to use the jacuzzi in the master bathroom of his home while no one else is present, calling a student over 480 times in the late evening over a four month period, and

MONTALVO V. SBEC
0068

a male coach giving a female athlete rubdowns and ice baths, failing to follow district protocol to send an injured athlete to the trainer is conduct that the SBEC considers to cross the bounds of the appropriate student-teacher relationship and is sanctionable conduct.

Respondent's actions crossed the bounds of an appropriate educator-student relationship and show that he is not presently worthy to hold a Texas educator certificate.

NOW, THEREFORE, IT IS ORDERED by the Board pursuant to the Texas Education Code Sections 21.031 and 21.041(b)(7) and the Board's rules promulgated in accordance with these statutes that Respondent **ERASMO MONTALVO, JR.'S** Texas Educator Certificate Number XXX-XX-66-13 is hereby _Revoked_ .

On behalf of the State Board for Educator Certification:

_BONNY L. CAIN, Ed.D_      _8-10-12_
BONNY L. CAIN, Ed.D        DATE

*Note: Pursuant to Board Order No. 990705DP1 issued under 19 Tex. Admin. Code § 249.7(a), the presiding officer of the State Board for Educator Certification may sign an order on behalf of the majority of members making the final decision on a case.*

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX C

| | | |
|---|---|---|
| ERASMO MONTALVO,<br>Plaintiff | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | TRAVIS COUNTY, TEXAS |
| THE STATE BOARD FOR<br>EDUCATOR CERTIFICATION AND<br>MICHAEL BERRY, THE ACTING<br>CHIEF OF THE STATE BOARD FOR<br>EDUCATOR CERTIFICATION, IN<br>HIS OFFICIAL CAPACITY ONLY | §<br>§<br>§<br>§<br>§<br>§<br>§ | 200TH JUDICIAL DISTRICT |

Filed in The District Court
of Travis County, Texas

MAR 28 2013 BP

3rd ___ M.

At ___
Amalia Rodriguez-Mendoza, Clerk

## AGREED ORDER DISMISSING MICHAEL BERRY

On this 28th day of MARCH____, 2013, the Court considered the Agreed Order Dismissing Michael Berry as a Defendant in the instant cause. After reviewing the pleadings and this Agreed Order, jointly filed by counsel for Plaintiff and Defendants, the Court is of the opinion that the Agreed Order Dismissing Michael Berry should be granted and that Michael Berry, The Acting Chief of the State Board for Educator Certification, In his Official Capacity Only, should be dismissed from this lawsuit. The Court finds that Michael Berry is not the Chief of the State Board for Educator Certification, and that the only proper defendant to this lawsuit is the State Board for Educator Certification.

IT IS THEREFORE ORDERED that Michael Berry, The Acting Chief of the State Board for Educator Certification, In his Official Capacity Only is hereby DISMISSED as a Defendant with prejudice to re-filing same.

*C/N D-1-GN-12-002991; Montalvo v SBEC and Michael Berry*

SIGNED on the 28TH day of MARCH , 2013

JUDGE PRESIDING
TIM SULAK

AGREED AS TO FORM AND SUBSTANCE:

Ellen M. Sameth
State Bar No. 17555550
OFFICE OF THE ATTORNEY GENERAL
ADMINISTRATIVE LAW DIVISION
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1838
Facsimile: (512) 320-0167
E-mail: Ellen.Sameth@oag.state.tx.us
ATTORNEY FOR DEFENDANTS

Mark W. Robinett
State Bar No. 17083600
BRIMM, ARNETT, ROBINETT
CONNERS & McCORMICK, P.C.
2525 Wallingwood Drive, Bldg. 14
Austin, Texas 78746
Telephone: (512) 328-0048
Facsimile: (512) 328-4814
E-mail: mrobinett@brimarnett.com
ATTORNEY FOR PLAINTIFF

CASE NO. 03-13-00370-CV

---

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

---

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee.*

---

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

---

APPELLANTS' BRIEF

---

APPENDIX D

| | | |
|---|---|---|
| TEXAS EDUCATION AGENCY | § | BEFORE THE STATE OFFICE |
| EDUCATOR CERTIFICATION AND | § | |
| STANDARDS DIVISION, | § | |
|     Petitioner | § | |
| | § | |
| | § | OF |
| V. | § | |
| | § | |
| | § | |
| ERASMO MONTALVO, JR., | § | |
|     Respondent | § | ADMINISTRATIVE HEARINGS |

## TABLE OF CONTENTS

I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY ........................................... 1

II. DISCUSSION ............................................................................................................. 2

    A.    Undisputed Background Facts .................................................................... 2

    B.    The Allegations ........................................................................................... 3

        1.    Allegations Set Forth in Staff's Pleading ....................................... 3
        2.    Unpled Matters ............................................................................... 4

    C.    Applicable Legal Standards ........................................................................ 5

    D.    Summary of the Evidence ........................................................................... 6

        1.    Overview ......................................................................................... 6
        2.    Statements by V.S. (Student 1) ...................................................... 8
            a.    V.S.'s Testimony ................................................................ 8
            b.    V.S.'s Statement at the Child Advocacy Center .............. 14
        3.    Testimony of Erasmo Montalvo ................................................... 16
        4.    Telephone Records ....................................................................... 20
        5.    Testimony of Other Witnesses ..................................................... 21
            a.    Student 1's Parents ........................................................... 21
            b.    Diana Garza-Louis, LPC ................................................ 24
            c.    Rio Grande City CISD Teachers and Coaches ................ 26
            d.    Rio Grande City HS Students and Parents ...................... 34
        6.    Other Evidence ............................................................................. 42

MONTALVO V. SBEC
0008

E.   ALJ's Analysis .................................................................................... 43

    1.   Witness Credibility ........................................................................ 43
    2.   Sexual Impropriety and Assault ...................................................... 45
    3.   Telling V.S. Not to Go to the Trainer .............................................. 48
    4.   Telephone Calls ............................................................................. 50
    5.   Student Use of Mr. Montalvo's Jacuzzi .......................................... 52
    6.   Summary and Recommendation ...................................................... 52

III.   FINDINGS OF FACT .................................................................................. 52

IV.   CONCLUSIONS OF LAW ........................................................................... 55

MONTALVO V. SBEC
0009

| TEXAS EDUCATION AGENCY | § | BEFORE THE STATE OFFICE |
|---|---|---|
| EDUCATOR CERTIFICATION AND | § | |
| STANDARDS DIVISION, | § | |
| Petitioner | § | |
| | § | |
| | § | OF |
| V. | § | |
| | § | |
| ERASMO MONTALVO, JR., | § | |
| Respondent | § | ADMINISTRATIVE HEARINGS |

## PROPOSAL FOR DECISION

The staff (Staff) of the Texas Education Agency, Educator Certification and Standards Division (TEA), on behalf of the State Board for Educator Certification (SBEC or the Board), brought this disciplinary action against Erasmo Montalvo, Jr., to permanently revoke his Texas Educator Certificate.[1] Staff alleges that Respondent engaged in sexual contact with a female high school student and otherwise treated her in a neglectful or harmful manner. The Administrative Law Judge (ALJ) finds the evidence fails to preponderate in support of Staff's allegations. The ALJ recommends that no sanction be assessed against Mr. Montalvo.

## I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

General issues of notice or jurisdiction are addressed in the findings of fact. Issues concerning the scope of the case, as determined by the pleadings, are discussed below in connection with Staff's allegations.

The hearing was held January 9-12, 2012, before ALJ Shannon Kilgore at the State Office of Administrative Hearings (SOAH) in the William P. Clements Building, 300 West 15th Street, Fourth Floor, Austin, Texas. Staff was represented by attorneys Richard J. Ybarra and Merle Hoffman Dover. Mr. Montalvo appeared and was represented by attorneys Mark Robinett

---

[1] TEA is authorized to provide administrative functions and services to SBEC. Tex. Educ. Code § 21.035.

and Corey Tanner. The record closed on March 9, 2012, with the parties' submission of reply briefs.[2]

## II. DISCUSSION

### A.    Undisputed Background Facts

Mr. Montalvo holds a Texas Educator Certificate issued by the Board. In the spring of 2008, Mr. Montalvo was a track and field coach at the Rio Grande City High School (Rio Grande City HS), part of the Rio Grande City Consolidated Independent School District (Rio Grande City CISD). He was also the physical education coach at a CISD elementary school.

Student 1 (also referred to as "V.S."),[3] a female senior under the age of 18, was on the high school track team coached by Mr. Montalvo. During the 2008 track season, she suffered a hamstring injury. Student 1 received a track and field scholarship to attend college in Corpus Christi the following year. She graduated from high school in May 2008 and left for college that August.

At some point during the 2008-2009 academic year, V.S. told a counselor at her college and her family that Mr. Montalvo had sexually assaulted her in the spring of 2008. In 2009, Mr. Montalvo was charged with two counts of second-degree felony improper relationship between educator and student. He was indicted in October 2009, and acquitted of both counts following a jury trial.[4]

---

[2] The parties' briefs included proposed findings of fact and conclusions of law. Proposed findings of fact and conclusions of law not specifically adopted in this proposal for decision (PFD) are overruled.

[3] This student was referred to in Staff's pleadings as "Student 1" but in the hearing mostly as "V.S." The ALJ therefore uses both methods of referring to the student.

[4] Respondent's Exhibits 1-3.

## B.   The Allegations

### 1.   Allegations Set Forth in Staff's Pleading

The primary allegation of Staff's Original Petition is that, in the spring of 2008, Mr. Montalvo engaged in unwanted sexual contact with Student 1 on a number of occasions. Staff's specific allegations of sexual impropriety are as follows:[5]

- Respondent [massaged] Student 1's leg/hamstring area and would move farther and farther up her leg as he massaged her. Ultimately, Respondent's touching became inappropriate, moving up into Student 1's genital area.

- Student 1, along with other female students on the girls' track team, would go to Respondent's home to soak in his "hot tub," which was actually a Jacuzzi-style bathtub in the master bedroom of his home. On one of these occasions when Student 1 was alone with Respondent in his home, in or around April 2008, Respondent invited Student 1 to use his "hot tub." He then asked her to lie on his bed so that he could massage her leg. At that time, Respondent then proceeded to engage in oral sex with Student 1.

- Subsequently, Respondent engaged in sexual relations with Student 1 on school property in the Field House.

- Continuing on through the spring semester of 2008, Respondent would engage in inappropriate touching of Student 1, sometimes occurring on school property.

Staff asserts that Mr. Montalvo told V.S. that if she told the athletic trainer she was injured, the trainer would not let her run in the district and regional track meets. Further, Staff alleges that, during the spring of 2008, Mr. Montalvo engaged in approximately 480 phone calls with Student 1, with over 80 of the calls placed after 10:00 p.m.

Mr. Montalvo denies all allegations of sexual misconduct. He denies any assertion that he told V.S. not to go to the trainer. He admits that there were phone calls with Student 1, but asserts that he does not know the number of calls. He denies that the calls were inappropriate.[6]

---

[5] The allegations are taken from Staff's Original Petition at 2-5, as amended through an unopposed oral motion at the hearing. 1 Tr. at 4-5.

[6] Mr. Montalvo's Answer at 2.

2.    **Unpled Matters**

In its opening statement[7] and closing arguments, Staff has made a number of additional assertions, including that Mr. Montalvo:  gave V.S. rides home; rubbed down and massaged female athletes, including V.S.; stretched female athletes in a way that looked inappropriate; allowed female athletes, including V.S., to take ice baths in the field house without a female coach present to supervise; was alone with female athletes, including V.S., in a hotel room; gave female athletes, including V.S., gifts; failed to refer V.S. for counseling in connection with her suicidal thoughts; slapped girls on their backsides; and took V.S. to be massaged by a female coach who was not licensed or certified to give massages.[8]  Staff specifically argues that many of these assertions constitute bases for sanction.[9]

There are no factual allegations in Staff's pleading[10] to support any of these contentions. While there are many factual assertions in Staff's pleading, there is no mention of rides home, stretching of female athletes, ice baths, being alone with female athletes, gifts, handling of an athlete with suicidal thoughts, slapping of backsides, or a massage by an uncertified female coach.  As to massages, Staff's pleading alleges that Respondent massaged V.S. immediately after her hamstring injury, that a massage on a later date became sexual, and that he told V.S. that he needed to continue to massage her due to her injury.[11]  However, there is no allegation that Mr. Montalvo should not have been engaged in non-sexual massages or rub downs of female athletes, as Staff argues.

At hearing, Staff orally amended the factual assertions in its pleading, but did not move to include factual allegations going to any of the matters described above.  In his reply brief, Mr. Montalvo objected to Staff's going beyond the confines of its pleading.[12]  The objection is

---

[7] Tr. at 19.

[8] Petitioner's Closing Argument at 6-20.

[9] Petitioner's Closing Argument at 20.

[10] Staff's Original Petition, as orally amended at hearing.

[11] Staff's Original Petition at 3-4.

[12] Respondent's Post-Hearing reply Brief at 7.

MONTALVO V. SBEC
0013

sustained; those matters are not considered as possible independent bases for sanction.[13] However, the ALJ does consider the evidence relevant to those matters in light of whether it supports the allegations actually pled by Staff.

## C.    Applicable Legal Standards

SBEC may take disciplinary action against an educator who is unworthy to instruct or supervise the youth of this state or who has violated one or more provisions of the Educators' Code of Ethics.[14] In this case, Staff contends that Mr. Montalvo is unworthy to supervise youth and that he violated the following provisions of the Code of Ethics: (1) Standard 3.2,[15] by knowingly treating a student in a manner that adversely affects the student's learning, physical health, mental health, or safety; (2) Standard 3.5,[16] by intentionally, knowingly, or recklessly engaging in physical mistreatment, neglect, or abuse of a student or minor; and (3) Standard 3.6,[17] by soliciting or engaging in sexual conduct or a romantic relationship with a student.[18]

---

[13] The ALJ has considered the possibility that these matters were tried by consent. *See* Tex. R. Civ. P. 67 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). They were raised in opening statement, and evidence relevant to them was admitted without objection. However, evidence about these matters was also potentially relevant as background and context for Mr. Montalvo's allegedly sexual conduct with V.S. Furthermore, Mr. Montalvo objected in his closing argument to these matters as independent bases for sanction, due to the fact that they were not pled. Trial by consent is a narrow doctrine, applicable in exceptional cases, and where such an objection is raised, a matter is not tried by consent. *See, e.g.,* UMLIC VP LLC v. T&M Sales & Envtl. Sys., 176 S.W.3d 595, 605 (Tex. App. Corpus Christi 2005, pet. denied) ("If a complaining party does not object to testimony on the issue but does object to its submission [to the jury] on some tenable ground, 'he cannot be regarded as impliedly consenting that [it] be tried when not raised by the pleadings.'") (internal citations omitted). In this case, therefore, the matters were not tried by consent.

[14] 19 Tex. Admin. Code § 249.15(b)(2), (3). The relevant provisions of the controlling rules have not changed in substance since the time of the events at issue in this case.

[15] 19 Tex. Admin. Code § 247.2(b)(3)(B) [now § 247.2(3)(B)].

[16] 19 Tex. Admin. Code § 247.2(b)(3)(E) [now § 247.2(3)(E)].

[17] 19 Tex. Admin. Code § 247.2(b)(3)(F) [now § 247.2(3)(F)].

[18] Staff alleges, too, that Mr. Montalvo violated Code of Ethics Standard 1.7, 19 Tex. Admin. Code § 247.2(b)(1)(G) [now § 247.2(1)(G)], by failing to comply with state regulations, written local school board policies, and other applicable state and federal laws. However, Staff has failed to identify in its pleading what written policies or laws, aside from other provisions of the Code of Ethics, Mr. Montalvo allegedly violated.

Staff further alleges Mr. Montalvo "has committed an act described in 19 TAC [Tex. Admin. Code] § 249.14(g)(1), conduct that indicates a risk to the health, safety, or welfare of a student or minor, parent of a student, fellow employee or professional colleague." The cited rule (which is now subsection (h)) establishes priorities for TEA's investigations, but imposes no obligations on teachers, cannot be violated by a teacher, and cannot be a basis for sanction of a teacher.

The forms of disciplinary action SBEC may take against an educator include placing restrictions or conditions on an educator's certificate, issuing an inscribed or uninscribed reprimand, suspending a certificate, issuing a probated suspension, and revoking a certificate.[19] SBEC and the ALJ are required to take the following factors into consideration in seeking, proposing, or making a decision in enforcement actions:

- The seriousness of the violation;
- Whether the misconduct was premeditated or intentional;
- Attempted concealment of misconduct;
- Prior misconduct;
- Whether the sanction will deter future violations; and
- Any other relevant circumstances or facts.[20]

If Staff proves that an educator engaged in or solicited sexual contact or a romantic relationship with a student (thereby violating Standard 3.6 of the Educators' Code of Ethics), the educator's certificate *must* be permanently revoked.[21]

## D. Summary of the Evidence

### 1. Overview

Staff offered the testimony of the following witnesses:

- Student 1;
- Yolanda Sanchez, Student 1's mother;
- Salome Sanchez, Student 1's father;
- Rey Ramirez, the Rio Grande City CISD Athletic Director;
- Esther Guerra Pena, a former coach with the Rio Grande City CISD;
- James Meguire, the head athletic trainer at the Rio Grande City HS;
- Mr. Montalvo, called as an adverse witness;

---

[19] 19 Tex. Admin. Code § 249.15(a).

[20] 19 Tex. Admin. Code § 249.17(c).

[21] 19 Tex. Admin. Code § 249.17(d)(1).

- Diana Garza-Louis, a licensed professional counselor who provided expert testimony about sexual abuse;

- Ricardo Altahif, an employee of the Rio Grande City CISD who worked with Mr. Montalvo during the time period in question; and

- Roel Gonzalez, the superintendent of schools for the Rio Grande City CISD.

Staff's other evidence includes, among other things, telephone records of Mr. Montalvo,[22] a DVD and transcript of an interview of V.S. at the Child Advocacy Center,[23] and copies of greeting cards with handwritten notes from Mr. Montalvo to V.S.[24]

Mr. Montalvo testified on his own behalf and offered the testimony of the following other witnesses:

- K.A., a student athlete who was coached by Mr. Montalvo and was a teammate of Student 1;

- Dina Pena, a parent whose daughters were student athletes coached by Mr. Montalvo and who were teammates of Student 1;

- Linda Lu, an assistant track coach at Rio Grande City HS at the time of the events in question in this case;

- E.P., a student athlete who was coached by Mr. Montalvo and was a teammate of Student 1;

- A.G., a student athlete who was coached by Mr. Montalvo and was a teammate of Student 1;

- Ricardo Saenz, the principal of North Grammar Elementary School in the Rio Grande City CISD, where Mr. Montalvo also coaches;

- Baldemar Garza, an attorney who advised Mr. Montalvo in his criminal case and who is the father of a young male track athlete who graduated from Rio Grande City HS and was trained by Mr. Montalvo;

---

[22] Staff's Exhibits 2, 2A, and 3.

[23] Staff's Exhibits 4 and 4A.

[24] Staff's Exhibit 5.

- K.T., a student athlete who was coached by Mr. Montalvo and was a teammate of Student 1;

- Ofelia Guerra, an elementary school teacher with the Rio Grande City CISD who has worked with Mr. Montalvo;

- Catherine Rubio, who is employed at North Grammar Elementary School and knows Mr. Montalvo;

- K.S., who is the daughter of Ricardo Saenz and who is presently a student track athlete at Rio Grande City HS coached by Mr. Montalvo; and

- A.B., a student track athlete at Rio Grande City HS presently coached by Mr. Montalvo.

Mr. Montalvo's other evidence includes, among other things, records reflecting his criminal acquittal and his telephone calls, multiple written statements from witnesses in this case,[25] a television interview of Mr. Montalvo and V.S., and police records concerning the alleged sexual assault.

### 2.    Statements by V.S. (Student 1)

#### a.    V.S.'s Testimony

Student 1 graduated from Rio Grande City HS in the spring of 2008. She went on to college at Corpus Christi A & M. She is presently still in school, is married, and has one child.

V.S. testified that she first met Mr. Montalvo when she was in the eighth grade and she participated in a summer track program he coached. Beginning as a freshman, she ran track throughout high school, and Mr. Montalvo was her coach. V.S.'s goals were to participate in the Olympics and obtain a college scholarship.[26]

When she first started running, V.S. said, she had been diagnosed with a heart murmur and leaking heart valve. Her doctor told her not to run because, if her heart began to pump very

---

[25] Respondent's Exhibit 16, a written statement of Erika Pratt, was inadvertently admitted at the hearing. It is hereby excluded based on a proper objection by Staff.

[26] Tr. at 31-39.

fast, she could have seizures. She stated that Mr. Montalvo advised V.S.'s parents that she should not run track. However, V.S. testified, "I told them if I was going to die, that I would die — I would rather die at the track than anywhere else, so I was going to continue running regardless." She said that her condition has improved.[27]

According to V.S., in her junior year, she progressed to the district and then the regional competitions.[28] That year only one student from Rio Grande City HS went to the state competition, A.G. V.S. stated that she and two other girls traveled to Austin with A.G., at Mr. Montalvo's invitation, to offer support during the state meet. While in Austin, said V.S., Mr. Montalvo asked each girl to come into his hotel room for about 20 minutes, during which time he gave each girl jewelry made by one of his relatives.[29]

In her senior year, Student 1 said, she was trying to gain a college scholarship through her participation in track. The track season began in February and culminated in the state meet in May, and the college scouts were watching seniors who were competing. V.S. and her parents looked to Mr. Montalvo to help them with the scholarship application process. Mr. Montalvo communicated with V.S.'s family frequently. No one in V.S.'s family had ever gone to college.[30]

On March 1 of V.S.'s senior year, at a meet in Donna, V.S. suffered a hamstring injury. A college scout was present to watch her compete. According to V.S., the injury made it difficult for her to walk. She testified that Mr. Montalvo went with her to the school bus, where he massaged her leg in an effort to get her to a point at which she could compete. Coach Lu massaged her, too. V.S. testified that nothing inappropriate happened at that time. Despite the rub downs, she was unable to compete. She also stated that the college scout talked to her that day and offered her a scholarship, despite her injury. She accepted the scholarship.[31]

---

[27] Tr. at 33-34.

[28] Tr. at 41.

[29] Tr. at 42-44.

[30] Tr. at 45-47.

[31] Tr. at 47-50, 138.

Student 1 went on to say that, following her injury, Mr. Montalvo did not refer her to a trainer, telling her that the trainer would prevent her from competing at the district meet, and that her failure to compete might put her scholarship in jeopardy. She said she did not see a doctor, but her mother took her to Mexico once or twice a week for shots to treat the injury. V.S. began using massages, a heating pad, and ice baths for her injury, which initially prevented her from running, working out like the other girls, or even picking up her leg. She stated that Mr. Montalvo would perform massages himself, in a field house that had mats and air conditioning.[32]

According to V.S., the massages became sexual. She stated that Mr. Montalvo would massage her leg (and sometimes both legs) from the ankle to her back, including her buttocks. She testified that he would also rub her vagina. She said the massages would occur before practice, after practice, and a few times before school, and that they happened in various locations. The offensive touching did not happen all the time, she stated. When he would start to touch her in an inappropriate way, she would tell him to stop, but he would say that he needed to massage the entire area, and any straying was inadvertent. Nonetheless, she said, he kept doing it. She stated that she kept allowing the massages because she wanted to get better so that her scholarship would not be in jeopardy, and Mr. Montalvo kept reminding her of that possibility. She could not afford to go to college without a scholarship.[33] V.S. missed the next three meets due to her injury, next competing at the district meet in early April.[34]

At some point after the massages had become sexual, said V.S., Mr. Montalvo offered her some money. She testified that, at the time, her parents were struggling financially. Mr. Montalvo, aware of this fact, told her that he had $2,000 with him, because he had just been paid, and he could give it to her. V.S. stated he told her he could provide the money "if you do something for me." She said that she declined, saying her parents would be fine. V.S. inferred that he was conditioning the offer of money on sex, and told the Child Advocacy Center that he

---

[32] Tr. at 51-54, 62, 140. It is unclear exactly what kind of shots V.S. received, or who administered them. There are references in the evidence to vitamin B-12 shots.

[33] Tr. at 54-59, 64, 87.

[34] Tr. at 60; Respondent's Exhibit 22.

had offered money for sex. V.S. acknowledged that, in her testimony in Mr. Montalvo's criminal trial, she testified that he had told her, "We don't have to have sex. You can just suck on it."[35]

V.S. asserts that, in about April, Mr. Montalvo raped her twice. The first time, she said, was in the field house. She testified that the two occurrences were within days of each other, some time prior to the regional meet (which was in late April). One day after practice, Student 1 stated, when everyone else had left, Mr. Montalvo gave her a massage on a mat in the field house. In the course of the massage, she said, he moved her "bikers" shorts to the side and placed his penis inside her vagina. V.S. stated that she had allowed him to give her a massage because she wanted to get better and compete, and because of the scholarship.[36]

The second alleged occurrence was at Mr. Montalvo's home. During her senior year, V.S. stated, she used the hot tub or Jacuzzi in Mr. Montalvo's bathroom at his home three times. She said that track girls did not use the hot tubs at the school, and they went to Mr. Montalvo's house because of the water pressure. On the first occasion, she went with three other girls. This was, V.S. said, the only time she saw Mr. Montalvo's wife present. The second time, one other girl accompanied V.S. The bath accommodated two people, and the girls each used the bath for 20 minutes. They wore sports bras or bathing suit tops, and "bikers" shorts. V.S. said that, on the third occasion, she went alone.[37]

When she got out of the Jacuzzi, V.S. testified, Mr. Montalvo asked her to take off her bikers so that he could give her a massage. She wore a bathing suit underneath. He put a towel on the bed, and she lay down on it on her belly. According to V.S., he undid her bathing suit at the back and massaged her whole body, saying that all the muscles are connected. Then, she said, he asked her to turn over, but he did not re-do her bathing suit, so she held it over her as she turned over. She stated that he touched her breasts and kissed her body, moving her panties

---

[35] Tr. at 106-108, 144, 147.

[36] Tr. at 84-91, 149-150.

[37] Tr. at 65-70.

MONTALVO V. SBEC
0020

aside and kissing her vagina. She said that she told him to stop, but he raped her. This was, said V.S., the second rape. Afterward, she stated, she grabbed her things and ran out to her car.[38]

After these events, said Student 1, she began to have suicidal thoughts. She stated she had not experienced any suicidal ideation prior to her sexual assault.[39] She specifically denied talking on the telephone to Mr. Montalvo about thoughts of suicide.[40]

V.S. competed in the regional meet held in late April in San Antonio, but did not qualify for the state meet to be held in May in Austin. She testified that Coach Montalvo massaged her inappropriately at the hotel at regionals, but that, after regionals, did not give her any more massages. Although she was not eligible to compete at the state meet, she traveled to Austin with student K.T., who did qualify. Student "E"[41] also went on the trip. According to V.S., Mr. Montalvo called the girls in one by one for about 10 or 15 minutes each, and he gave each a little present.[42] V.S. said that he told her he would visit her the following year in Corpus Christi, and he would make up a story so that his wife would think he had gone hunting.[43]

V.S. testified about telephone calls with Mr. Montalvo in the spring of 2008. She said that he would often call her. She would also call him because, if she did not, he would call her. The calls occurred at night, following practice, sometimes very late. Some calls were long. Student 1 stated that they would discuss track and her upcoming races, how she needed to visualize a race in her head to make it easier, and her scholarship. The number of calls went up quite a bit following her hamstring injury. She indicated that the calls were not sexual in nature, except that Mr. Montalvo would talk about his problems with his wife, and how they did not have sex. V.S. also said Mr. Montalvo would "tell everyone" about his marital problems. She said that most of the conversations were just him talking, and he often repeated himself. There

---

[38] Tr. at 70-78.

[39] Tr. at 126.

[40] Tr. at 850.

[41] The ALJ surmises this was Student E.P., who was a witness in this case.

[42] At another point in her testimony, Student 1 said that Mr. Montalvo talked to her for longer than he did to the other girls. Tr. at 130.

[43] Tr. at 91-95, 153-154.

was nothing, she stated, that he told her on the phone that he could not have told her during the day.[44]

V.S. complained that Mr. Montalvo stretched girls in inappropriate ways. She described leg stretches in which Mr. Montalvo was close to the girls' bodies. She said that the stretching occurred out in the field.[45] V.S. also stated that Mr. Montalvo would smack girls on the butt.[46]

V.S.'s parents trusted and admired Mr. Montalvo, stated V.S. He assisted with the scholarship, he sometimes visited V.S.'s home, and he once came to the house to show V.S.'s parents how to rub down her injured area. In mid-May, when there had been some difficulty with getting the proper amount of financial aid, Mr. Montalvo went to Corpus Christi with V.S. and her mother to iron out the problem. V.S. stated that she did not want him to go, and told her mother so, but her parents trusted Mr. Montalvo so much that they insisted he go.[47]

Throughout the spring, said V.S., she did not tell anyone about the assaults. She stated that she was afraid to tell her parents because her father has a very bad temper. She also wanted to compete, and she was afraid others would not believe her, because Mr. Montalvo had a way of manipulating everyone into thinking that everything he did was okay. She did not want to be around him, but she felt she had to act like nothing was going on. She laughed and talked around him, including when they were being filmed for a local television news story about her scholarship.[48]

In the summer of 2008, V.S. testified, she began to voice her accusations. She stated that, in June, she told her mother that Mr. Montalvo had touched her. Student 1 said that she told her mother in English, and her mother did not really understand what she had said. Her mother called her father, who came home and became so angry that V.S. did not want to offer more

---

[44] Tr. at 95-101, 169-170.

[45] Tr. at 79-83.

[46] Tr. at 135-136. V.S. made similar statements in the Child Advocacy Center interview. Exhibit 4 at 8-10.

[47] Tr. at 106, 108-110, 136.

[48] Tr. at 79, 105, 134, 154-157.

details. Her father got a gun and said that he was going to kill Mr. Montalvo. She did not tell him more because her father had been in jail before, and she did not want him to do something and have to go back. And, she did not want to tell anyone else because she knew she would be the subject of gossip. She did call Mr. Montalvo, she stated, and told him that she had told her parents what had happened, and not to bother her anymore. After that, she indicated, he never called her again. Then, after she went to college, V.S. discussed these matters with a counselor, who reported them to the authorities because V.S. had been underage in the spring of 2008. Now, V.S. said, people whisper about her when she is out in public in Rio Grande City.[49]

V.S. acknowledged that, in the fall of 2009, she returned home and attended a track meet at which she had contact with Mr. Montalvo. She denied requesting to ride on the bus with the team.[50]

V.S. also acknowledged that, following the events in this case, she made a false outcry to the police that she had been kidnapped. She testified that she did so because she wanted someone to stay with her, and not leave her alone, and she wanted that person's attention. She stated, "That's what I had to do to have somebody in the apartment with me."[51] Student 1 further admitted to lying on Facebook about being pregnant in order to get her boyfriend to stay with her in an apartment because she does not like being alone.[52]

### b.     V.S.'s Statement at the Child Advocacy Center

Student 1 was interviewed by a worker at the Child Advocacy Center in Rio Grande City on May 28, 2009.[53] In the interview, V.S. described events in the spring of 2008. This summary

---

[49] Tr. at 110-115.

[50] Tr. at 157-159.

[51] Tr. at 124-125. She did not identify whose attention and company she was seeking. From the context of the questioning, it appears that it may have been her boyfriend.

[52] Tr. at 120. V.S. did not further elaborate. Other evidence in the case indicates that the Facebook post occurred in the spring of 2009. Tr. at 460-461 (K.A. testimony).

[53] The DVD and the transcript of the interview are Staff's Exhibits 4 and 4A.

only sets out V.S.'s statements that differ from, or add to, what she said in her testimony at hearing.

Overall, said Student 1, the inappropriate massages occurred 50 times or more, as Mr. Montalvo was giving her such massages up to 4 times per day.[54] The abuse occurred at the middle school field house, the high school weight room, and at his house.[55] She stated she did not tell her parents because they would not believe her.[56] She also said that, if she did not kiss Mr. Montalvo as he requested, he would tell her parents that she was underperforming in track, and they would get mad at her.[57]

Concerning the alleged incident in which Mr. Montalvo offered V.S. money for sex, she stated in the interview:

> And he was like uh...I've heard that your [sic] like really good and whatever. He was like I know your ...will you ever have sex with me? And I was like no coach I will never do that with you. And he was like well I know your parents need money and stuff, I have money, I just went to the bank right now, I have $2,000 with me. That's what he said I was like no I'm not going to do that coach.[58]

In the interview, V.S. described only one incident of rape: the occurrence in the field house. Her description was largely consistent with that of her testimony at hearing. She stated that Mr. Montalvo told her not to tell anyone or she would lose her scholarship and be "a nobody." She also stated that, afterward, she asked an older friend to buy "plan B" for her.[59]

With respect to what happened when V.S. went alone to Mr. Montalvo's house to use the hot tub, she stated in the interview he massaged her. She said that, every other time she had been to Mr. Montalvo's house, his wife had been present, but this time she was not there. According

---

[54] Staff's Exhibit 4A at 16.

[55] Id. at 17-18.

[56] Id. at 17.

[57] Id. at 19.

[58] Id. at 12.

[59] Tr. at 22-27. The ALJ assumes that "plan B" is the brand name or colloquial expression for a "morning-after" contraceptive.

to V.S., he took her bra off, then put it back on, and he touched various private parts of her body and engaged in oral sex. She said intercourse did not occur.[60]

When talking about the state track meet in Austin in May of her senior year, V.S. said that Mr. Montalvo brought in each other girl to his hotel room to talk for about 15 minutes, but that he kept V.S. in there for 2 hours. She said that he made her hug and kiss him.[61]

In the interview, Student 1 said the first person she told about these events was her counselor at college. She told the counselor because of the emotional strain, she indicated. Then, she said, she told her parents in February 2009.[62]

### 3.    Testimony of Erasmo Montalvo

Mr. Montalvo began working as a teacher in 1992. At first, he was a "holding teacher" with no certification or benefits. Then, in about 1995, he received emergency certification, followed by full certification in 1997. He has been working as a full-time teacher ever since.[63]

V.S. and Mr. Montalvo first met in the summer before she entered ninth grade. According to Mr. Montalvo, he never touched V.S. in any inappropriate way or in a way that could have been misinterpreted as inappropriate.[64]

In the summer of V.S.'s freshman year, said Mr. Montalvo, her doctor told her she had a heart condition that could make it dangerous for her to run. Mr. Montalvo stated that he told V.S.'s mother that, if she were his child, he would not let her run. However, V.S.'s mother replied that she was going to let her daughter do what she loved to do.[65]

---

[60] *Id.* at 14-16, 43-46.

[61] *Id.* at 34.

[62] *Id.* at 38-39.

[63] Tr. at 725-727.

[64] Tr. at 727-728.

[65] Tr. at 371-372.

MONTALVO V. SBEC
0025

Mr. Montalvo was asked about the occasion of V.S.'s injury at the Donna meet. He said that he did not touch or massage V.S.'s hamstring because he was busy with all the other events at the meet.[66] He stated that Assistant Coach Lu checked out V.S.'s injury. He further said that V.S.'s father approached him at the meet after V.S. was injured. According to Mr. Montalvo, her father said, "I want to handle this. I will take her to the doctors. I don't want her seeing a trainer." Mr. Montalvo said he told V.S.'s father he would prefer for V.S. to see the trainer, but the father said the trainer would make her sit out. In Mr. Montalvo's words, "Her parents were extreme on having her perform." According to Mr. Montalvo, V.S.'s father said he would take V.S. to a doctor in Mexico.[67]

The college recruiter gave V.S. a scholarship contract at the Donna meet. Mr. Montalvo testified that, after the meet, he looked over the contract at the request of Student 1's parents, and told them he thought it was a good deal.[68]

Mr. Montalvo further testified that, following the meet, back at home, he told V.S. to go to the trainer, but she refused, as she had in the past. Mr. Montalvo said that she told him she was seeing a doctor in Mexico. However, at another point in his testimony he stated that he should have sent her to see the trainer, but he could not recall whether he did so, and he also said that he did not send her, saying that she refused to go. According to Mr. Montalvo, V.S. was afraid of not being allowed to participate at district in her senior year. Mr. Montalvo also said that, once V.S. regained her range of motion about two weeks following her injury, he would rub down her hamstring. However, he stated, he would never give her more extensive or inappropriate massages. He said he gave other girls rub downs, too. Overall, he addressed V.S.'s injury with stretching, rub downs, ice baths, and the whirlpool. He denied telling her to go to Mexico for injections. He said that V.S. was able to resume competing, and in fact she competed at district, qualifying for regionals. Mr. Montalvo stated that he never told V.S. she

---

[66] Tr. at 361-365, 738, 798. While not required by SOAH's procedural rules to so, Mr. Montalvo filed an answer in this case. He responded "admit" to the following allegation: "In or around February of 2008, Student 1 injured her hamstring while running at a track meet. Respondent took Student 1 to a bus and massaged her leg at that time." Respondent's Answer (attached to Staff's Notice of Hearing filed with SOAH). There is no allegation or evidence that, if such a massage occurred that day, it was in any way sexual.

[67] Tr. at 355, 357-358, 360, 366, 369, 370, 389, 736-738, 754, 796-797, 825-826.

[68] Tr. at 794-795.

MONTALVO V. SBEC
0026

could lose her scholarship if she went to the trainer. He said he just told her that the college's contract said if a student did anything that might embarrass the school, the student could lose the scholarship.[69]

As to being alone after practice with V.S. at the field house, Mr. Montalvo testified that he did not think that had ever happened. He said that he sometimes, but not frequently, had V.S. or other girls stay after practice if they needed to work on something particular. He said most of the hamstring rub downs he administered occurred in the field, and he could not recall whether he ever rubbed her leg down in the field house, but he never rubbed her down alone in the field house after everyone else had left.[70] He also said that he occasionally gave V.S. rides home late at night after track meets in her senior year, so he was alone with her for a few minutes on those occasions.[71]

Mr. Montalvo testified about the students' use of his Jacuzzi. He stated that there were two occasions: one over spring break and one during Easter break. During those times, he said, the whirlpools and ice baths at school were unavailable because the school personnel responsible for unlocking the training room were not inclined to do that during school breaks. Around the time of spring break, Mr. Montalvo testified, V.S. was just starting to jog and participate in practice following her injury, and she wanted to use the Jacuzzi. She came with two other girls. Mr. Montalvo said his wife was present in the house while the girls used the Jacuzzi.[72] On the second occasion, V.S. came alone during Easter break. According to Mr. Montalvo, his wife and children were present in the house on that occasion, too.[73]

---

[69] Tr. at 342-349, 358,368, 370, 394, 402-403, 736, 738-741, 750, 752-753, 799.

[70] Tr. at 347-348, 384-386, 409, 411-412, 741-742, 800-801.

[71] Tr. at 830.

[72] Mr. Montalvo further testified that, due to the stress and embarrassment arising out of his criminal prosecution, he and his wife separated following his trial. Tr. at 732.

[73] Tr. at 394-401, 410-411, 756-760, 812-815, 817-820. Mr. Montalvo said he also sent V.S. and another girl to Baldemar Garza's house for cardio aqua therapy, because he was the only person Mr. Montalvo knew who had a pool. Tr. at 803.

Mr. Montalvo denied offering V.S. or her family any money, for sex or otherwise. He stated that, at that time, he was not in a position to give money to others, and it took him about 3 weeks to make $2,000.[74]

· V.S. went to the State track meet in Austin in May 2008. Although she had not qualified for state, she and another girl who had not qualified were allowed to go. Mr. Montalvo explained that throughout the years, V.S. had done very well, practiced, and given her all, so it was appropriate for her to attend. He stated that he met with each girl in his hotel room for about 10 minutes, during which time he kept the door open. He gave each girl a little gift, costume jewelry that his sister had made, and told each girl it was a token for her hard work and dedication. He said that, as he talked to them, he tried to be motivational and to hit on the positive points of what they had done right and what their futures held.[75]

Mr. Montalvo described V.S. as someone lacking in self-esteem who needed constant attention and reinforcement. She "needed to hear the praise, to hear you can do it, you can do it." He indicated that she was emotionally needy, having to "hear it and hear it and hear it" so that she could believe it.[76]

With respect to the phone calls, Mr. Montalvo stated that the number of calls with V.S. jumped in February or March of 2008, when she suffered her hamstring injury. He said that the injury was devastating to Student 1's family. Her senior year was supposed to be her year to shine. He stated that the injury made her feel so down that she told him, on one occasion, she had had a suicidal thought the previous week. He did not want to tell her parents because he was afraid they would overreact, especially as V.S.'s father had an explosive temper. Mr. Montalvo testified that he spent time on the phone with her, reading aloud motivational quotations from John Wooden (the UCLA basketball coach) and talking to her about track, her problems, and how to get into a better state of mind. He stated that they sometimes talked at night, after his children went to sleep. Mr. Montalvo said that V.S. would often text him, and he would call her

---

[74] Tr. at 743.

[75] Tr. at 745, 804-805. Mr. Montalvo said that the jewelry cost about five to ten dollars. *Id.* at 337, 754.

[76] Tr. at 728, 786, 790.

back. He stated he did not talk to V.S. about his relationship with his wife. V.S. told him that she did not have many friends, and he thought that talking to her would help her. Mr. Montalvo also talked to other girls on the telephone; he identified K.A., A.G., E.P., and V.C., saying that he would talk to them about track, how to improve their performance and to train, and also about their problems. He thought at the time that the phone calls were appropriate, that he was being helpful to V.S. He felt that she was getting better over time. He stated, "I thought I was making a difference."[77]

When girls graduated and planned to run track at the next level, said Mr. Montalvo, he would buy them shorts, wind suits, shirts, and shoes that they could use for their athletics. He said that he did this for V.S., too, but he never singled her out for special treatment.[78]

Mr. Montalvo stated that V.S.'s behavior toward him never changed. After graduation, Mr. Montalvo arranged for a television interview about her scholarship; they both participated in the interview, in which V.S. acted excited and happy. Mr. Montalvo stated that she would hug him every day, she showed up at summer track practice, and she was still behaving very friendly toward him in April 2009 (just before he learned of her accusations), when she attended one of the meets. Indeed, said Mr. Montalvo, V.S. wanted to ride with the team on the school bus to that meet, but he had to tell her no because of liability insurance concerns. V.S. still attended the meet, he said, spending the whole day there, helping him coach several events.[79]

### 4.    Telephone Records

Mr. Montalvo and Student 1 exchanged about 480 phone calls from February through June 2008. The calling peaked in March and April 2008, with about 160 total calls for each of those months. Over the February-through-June period, 82 calls were after 10:00 p.m., with Mr. Montalvo placing 80 percent of the late-night calls and V.S. placing 20 percent of them.

---

[77] Tr. at 404-406, 728-732, 734, 756-757, 770-771, 774, 785-786, 789. Mr. Montalvo said he mentioned to his assistant coaches that he was trying to help V.S. out, and he also talked to E.P., to see if she could befriend V.S. *Id.* at 407, 785-786.

[78] Tr. at 337, 755.

[79] Tr. at 748-749, 761-764, 821-822; Respondent's Exhibits 23 and 24.

Overall, Mr. Montalvo placed 66 percent of the calls, and V.S placed 34 percent. Most of the calls lasted just seconds or a few minutes. Nineteen calls lasted over a half-hour, and 4 calls lasted an hour or more. All calls between Mr. Montalvo and V.S. ended in late June.[80]

### 5.    Testimony of Other Witnesses

#### a.    Student 1's Parents

*Yolanda Sanchez*, V.S.'s mother, testified that she knew and trusted Mr. Montalvo.[81] She stated that, when her daughter injured her hamstring, he told them that she should not go to the trainer because colleges, when they award scholarships, look to see if a student athlete has an injury on her record.[82]

According to Ms. Sanchez, Mr. Montalvo helped V.S. with the paperwork for her scholarship and even traveled to Corpus Christi with them to meet with representatives of the college. Ms. Sanchez stated that V.S. has not wanted Mr. Montalvo to go with them, but Mr. and Ms. Sanchez insisted he go to help with the scholarship issues.[83]

Ms. Sanchez said that she saw Mr. Montalvo slap V.S.'s bottom on two occasions at her home. The first time, she said, V.S. got upset and told him to stop. Ms. Sanchez said that she, too, asked Mr. Montalvo to leave V.S. alone, and he just turned around and left. The second time Mr. Montalvo slapped V.S.'s bottom, Ms. Sanchez stated, occurred on the same day.[84] Ms. Sanchez said that she saw Mr. Montalvo poke V.S. in the ribs, and V.S. became upset.[85] Ms. Sanchez also said that V.S. stopped wanting to go to practice alone, so Ms. Sanchez would

---

[80]  Staff's Exhibits 2 and 3; Respondent's Exhibits 4 and 5.

[81]  Ms. Sanchez testified through an interpreter.

[82]  Tr. at 179-180.

[83]  Tr. at 184-185.

[84]  Tr. at 181-182. Ms. Sanchez did not explain whether Mr. Montalvo returned to the house.

[85]  Tr. at 185-186, 192.

MONTALVO V. SBEC
0030

send one of her sons along. In addition, V.S. did not want any pictures taken with Mr. Montalvo at her graduation.[86]

One day, said Ms. Sanchez, V.S. came home from Mr. Montalvo's house, where she had been using the Jacuzzi for the second time. V.S. came into the house wrapped in a towel and crying, but she would not say why she was so distraught. When pressed, said Ms. Sanchez, V.S. told her that she was upset about her leg injury.[87]

On another occasion, said Ms. Sanchez, V.S. was late coming home. She called V.S. repeatedly and got no answer. According to Ms. Sanchez, she called Mr. Montalvo, who said that V.S. was with him. Ms. Sanchez said she could hear V.S. crying in the background, and Mr. Montalvo said it was because she was upset about her leg injury. When asked what the matter was, V.S. told her mother it was her leg.[88]

Ms. Sanchez testified that she knew Mr. Montalvo talked to V.S. late at night for long periods. She would ask her daughter why there were such late calls, and she said that he was giving her advice for the next meet and that sort of thing. Ms. Sanchez said that Mr. Montalvo would also talk to V.S. about his problems with his wife, and would even call Ms. Sanchez and tell her, too, about his marital problems.[89]

According to Ms. Sanchez, she first learned about what had happened to V.S. from her husband. After V.S. went to college, she told her father that Mr. Montalvo had assaulted her. Ms. Sanchez testified that V.S. and her father returned home that day, and Mr. Sanchez told his wife that Mr. Montalvo had raped their daughter. Ms. Sanchez said that she fainted, and her other children called their grandmother to come over because their mother was not doing well. Ms. Sanchez stated this was the first time that V.S. had suggested that Mr. Montalvo had done

---

[86] Tr. at 192-193.

[87] Tr. at 182-184.

[88] Tr. at 187.

[89] Tr. at 188.

anything wrong. She did not recall any time in the summer when V.S. said that Mr. Montalvo had touched her and Mr. Sanchez got his gun out.[90]

*Salome Sanchez*, V.S.'s father, testified that he trusted Mr. Montalvo "100 percent" and that he was like a second father to V.S. Mr. Sanchez said he talked frequently with Mr. Montalvo to keep up with his daughter's track activities.[91] According to Mr. Sanchez, Mr. Montalvo assisted the family in all aspects of obtaining a college scholarship for V.S., who was the first person in the family to go to college. The scholarship, he said, meant a great deal to V.S.[92]

After V.S. injured her hamstring at the Donna track meet, said Mr. Sanchez, Mr. Montalvo would not let V.S. go to the trainer. Mr. Sanchez stated that Mr. Montalvo said going to the trainer could affect her scholarship, and V.S.'s rehabilitation would be managed instead by himself and V.S.'s mother and father. According to Mr. Sanchez, this conversation occurred when Mr. Montalvo came to V.S.'s home to discuss the scholarship contract, just after the Donna meet. Mr. Sanchez denied telling Mr. Montalvo that he would handle his daughter's injury himself. Mr. Sanchez testified that his wife took V.S. to Mexico for B-12 shots on Mr. Montalvo's advice.[93]

Mr. Sanchez also stated that Mr. Montalvo offered to lend him $2,000 to get through difficult financial times. While he appreciated the offer, said Mr. Sanchez, he did not accept. Mr. Sanchez stated that V.S. never told him that Mr. Montalvo had offered her money.[94]

Mr. Sanchez testified that, while she knew that his daughter spent time talking to Mr. Montalvo by phone, he was unaware of the frequency or length of the calls.[95]

---

[90] Tr. at 188-191, 194.

[91] Tr. at 201, 221.

[92] Tr. at 203, 215.

[93] Tr. at 205-206, 842-846.

[94] Tr. at 208, 225-226.

[95] Tr. at 201-202.

One day early in the summer break in 2008, said Mr. Sanchez, his wife called him at work and said she needed to talk to him about something important concerning their daughter and Mr. Montalvo. Mr. Sanchez went home, and V.S. told him that Mr. Montalvo had touched her. Mr. Sanchez said he grabbed his gun and pressed V.S. to tell him more. She just kept crying, however, and would not say more. He did not call the police because V.S. was embarrassed and did not want anyone to know what had happened. Mr. Sanchez said that he had no further contact with Mr. Montalvo after this time.[96]

Then, said Mr. Sanchez, after V.S. had gone to college in Corpus Christi, he went to visit her. He kept asking her what had really happened. They were driving, and they pulled over, and she finally "busted" and told him that Mr. Montalvo had penetrated her. Mr. Sanchez said he took V.S. back home, called a family meeting, and contacted the police.[97]

Mr. Sanchez stated that he was not aware of V.S.'s ever telling him anything that was not true.[98]

### b.    Diana Garza-Louis, LPC

Ms. Garza-Louis is a licensed professional counselor specializing in sexual abuse, counseling both offenders and victims. She is a licensed sex offender treatment provider, and she has been practicing counseling since 1984.[99] She testified as an expert witness in this case.

Prior to her testimony, Ms. Garza-Louis reviewed Staff's petition and Mr. Montalvo's answer in this case, police records, the DVD (and transcript) of the interview of V.S. with the Child Advocacy Center, a CPS report, charts concerning phone calls between Mr. Montalvo and

---

[96] Tr. at 209-211. Mr. Sanchez stated that if V.S. had "called other people," he would have killed Mr. Montalvo. Tr. at 224. It is not clear to the ALJ what he meant by that statement.

[97] Tr. at 211-214.

[98] Tr. at 223.

[99] Staff's Exhibit 7.

V.S., the testimony of V.S. in the criminal trial, unspecified witness statements, and a television interview of V.S. and Mr. Montalvo concerning her track scholarship.[100]

Ms. Garza-Louis found V.S. to be believable. According to Ms. Garza-Louis, V.S.'s confusion about some details of events was consistent with the disassociation experienced by some victims of sexual abuse. Further, said Ms. Garza-Louis, V.S.'s periodic displays of emotion in her taped interview were consistent with the behavior of a victim of abuse who is trying to be strong but succumbs, at moments, to sadness.[101]

In addition, Ms. Garza-Louis indicated that V.S.'s description of Mr. Montalvo's actions matched patterns of sexual abuse involving grooming, secrecy, and manipulation. Ms. Garza-Louis stated that sexual abusers often begin to set up a situation for abuse by interacting with the victim in a caretaking role. She pointed to the massages V.S. said Mr. Montalvo gave her, and his help in obtaining the scholarship she so wanted. In this way, Ms. Garza-Louis said, a sexual abuser creates an atmosphere of trust in which the next step – sexual contact – will not seem so shocking. She said that secrecy, such as Mr. Montalvo's telling V.S. not to go to the trainer with her injury, is also often part of the equation. And, she stated, the world of athletics, with its close relationships and physical contact, is an environment especially suited for this kind of abuse. She views V.S.'s high degree of need for attention and care, her lack of close friends, and her desire not to disappoint as making her particularly vulnerable. The anxiety, depression, and loss of interest in track reported by V.S. are typical reactions to abuse.[102]

Ms. Garza-Louis said that the year-long delay before V.S.'s outcry does not diminish her credibility at all; many sexual abuse victims wait some time before voicing their experiences, in part because they feel shame and embarrassment.[103] V.S.'s continuing to seek Mr. Montalvo's company and act normally, even after the onset of the abuse, also reflected a known pattern among victims, referred to as "repetition compulsion," which is a tendency to repeat a harmful

---

[100] Tr. at 419-420. Ms. Garza-Louis did not speak to anyone involved in this matter, nor did she hear any of the testimony in this case. *Id.* at 440.

[101] Tr. at 422.

[102] Tr. at 423-428, 429-431.

[103] Tr. at 428-429.

situation in an attempt to correct it psychologically.[104]   Also, Mr. Montalvo's popularity and standing in the community do not mean that he was incapable of committing sexual abuse.[105]

Ms. Garza-Louis saw no motivation for V.S. to make up these charges. She said that some people may fabricate charges in order to gain attention, but she saw no sign of that in this case. In fact, she noted, the attention V.S did receive as a result of her accusations was negative, in that she suffered rejection in the community.[106]

On cross-examination, Ms. Garza-Louis acknowledged that there are indications in the materials she reviewed that V.S. is not considered a trustworthy person, and that she had lied in the past in a manipulative manner.[107]

### c.     Rio Grande City CISD Teachers and Coaches

*Rey Ramirez* has been with the Rio Grande City CISD for 16 years, and is presently in his sixth year as athletic director for the district. He has served as a coach for 13 years.[108]

According to Mr. Ramirez, while CISD coaches are now told not to rub down students and to let the trainers do it, no such policy existed in 2008.[109] He testified that the coaches have been told that if an athlete is injured, it is protocol that the trainer be contacted, so that the trainer can refer the athlete to the doctor or provide first aid.[110]

---

[104] Tr. at 431-433.

[105] Tr. at 426.

[106] Tr. at 433-435.

[107] Tr. at 439-440, 442. The ALJ surmises that the material to which Ms. Garza-Louis referred was, at least in part, V.S.'s testimony under cross-examination at the criminal trial.

[108] Tr. at 230-231.

[109] Tr. at 234, 246, 254-255. He said there is no policy that coaches cannot stretch athletes, but that they should just use their best judgment and do it in a way that does not appear inappropriate. Tr. at 246.

[110] Tr. at 234-235, 242.

Mr. Ramirez stated that coaches are advised not to give students rides home,[111] and he does not believe it is appropriate for a coach to allow a student athlete to use a Jacuzzi in the master bath of the coach's house.[112] He stated that over 400 calls with a student in a four-month period is excessive and not appropriate, although he further said that the only thing that would make phone calls problematic is inappropriate content. He explained that if the coach is trying to help the student progress as an athlete, phone calls would not be a problem, although he said he was a "little bit concerned" about carrying out this kind of work on a daily basis outside the context of practice sessions.[113] Mr. Ramirez state that, while there is no rule against it, a coach's being alone in a hotel room with a student is not a good idea, and a student could make a false accusation about impropriety in such a circumstance.[114]

Mr. Ramirez said that he has worked with Mr. Montalvo for about five years, and has never seen him do anything improper.[115]

**Esther Guerra Pena** was a coach with the Rio Grande City CISD for 10 years, her last year being 2007. She did not coach with Mr. Montalvo in 2008. She is now the head secretary for the athletic department of the junior and high schools.[116]

Ms. Pena testified that, through her coaching, she knew V.S. and had daily contact with her in 2007, although Ms. Pena stated, "I didn't know her-know her. I just...know her as a coach." Ms. Pena believes that V.S. is a truthful person.[117]

Ms. Pena also knows Mr. Montalvo, having coached with him for four years.[118] She said that he was a strict coach, and respected, especially because he had so many athletes he had

---

[111] Tr. at 232.

[112] Tr. at 241.

[113] Tr. at 241-242, 247, 256-257.

[114] Tr. at 241-242, 245, 252-253.

[115] Tr. at 248-251.

[116] Tr. at 261, 268-269.

[117] Tr. at 261-262, 278.

[118] Tr. at 262.

known since they were very young. People obeyed him.[119] However, she said Mr. Montalvo's method of stretching the legs of some female athletes did not look appropriate (even though the mechanics of the stretching were fine). Assistant coaches mentioned it to Mr. Montalvo. Some girls refused to be stretched by him, but the girls he had coached since they were very young were comfortable with it.[120] Ms. Pena also said that Mr. Montalvo would slap girls "not on their butt/butt," but "in between the hip and the butt" or "near" the butt, in a manner that said "Go get them" or "Good luck, good job." He did this when the parents were present, but a coach from another school once said it looked bad. Ms. Pena indicated that the propriety of this conduct was something that people could have different opinions about.[121]

*James Meguire* is the head athletic trainer at Rio Grande City HS. He has held the position since 1998, and is presently licensed by the State of Texas as a trainer.[122] His job is to recognize, assess, treat, manage, rehabilitate, and recondition athletic injuries under the direction of a licensed physician. He knows Mr. Montalvo, who started working for the district in the early nineties. Mr. Meguire testified that Mr. Montalvo, although an educator, is not a licensed trainer and therefore cannot practice athletic training.[123]

Mr. Meguire testified that it has always been the Rio Grande City CISD's policy to report injuries to the athletic trainer. He said that the coaches are supposed to talk to the parents. If the trainer is unavailable and the parents want the child to be seen immediately, they can take the child to the doctor, but the coaches usually have the children go to the trainer first for the coordination of insurance paperwork. Parents can decide to take the child to the doctor instead of to the trainer, take the child to Mexico for shots (which, Mr. Meguire said, is common), or do nothing at all. According to Mr. Meguire, Mr. Montalvo is aware of procedures and usually calls the trainer when a student athlete gets hurt. If a student with an injury is not reported to the

---

[119] Tr. at 263-264.

[120] Tr. at 264-267, 270, 272. Ms. Pena said that, after about 2005, there were no student trainers to stretch athletes, so they would ask the coaches to do it.

[121] Tr. at 267-268, 272-275.

[122] Tr. at 284-285. Mr. Meguire also worked as a trainer for the Rio Grande City CISD from 1990 to 1997. *Id.* at 284.

[123] Tr. at 286-288.

trainer, the athlete may not get adequate medical attention, may not be able to compete at maximum ability, and may suffer from prolonged injury.[124]

According to Mr. Meguire, it is not appropriate to treat athletes at home. He characterized such a practice as unethical, stating that it "opens you up to liability and accusations, and it's an inappropriate place to do treatments."[125] He stated, however, that there is no actual rule against it.[126]

In general, said Mr. Meguire, he is careful in the way he treats female athletes, limiting his physical contact and avoiding stretching and rub downs to head off any accusations of impropriety. He uses student trainers or his female aide for much of the necessary physical contact. This policy is not written, however.[127]

At one point, Mr. Meguire talked to Mr. Montalvo about stretching the girls. Mr. Meguire had never seen Mr. Montalvo stretch his athletes, but two assistant coaches mentioned to Mr. Meguire that it looked inappropriate. Mr. Meguire indicated that there had been an earlier incident with a Rio Grande City CISD assistant trainer who had inappropriate relationships with female students, and there was a need for caution because the athletic staff was under scrutiny. Mr. Meguire's concern was the possibility that someone who did not like the coach could make an accusation that he was doing something wrong. Mr. Meguire said that stretching the hamstring muscle involves pulling the athlete's leg up, putting the stretcher's head near the athlete's groin area, and it looks inappropriate even when done properly. Mr. Meguire told Mr. Montalvo to be careful, and he replied that he would take the matter under advisement. Mr. Meguire said that he is not Mr. Montalvo's supervisor. He also noted that the stretching was part of Mr. Montalvo's routine as a coach, and coaches do not easily change their routines. Mr. Meguire said there was no written rule about male coaches stretching female athletes.[128]

---

[124] Tr. at 288-294, 328.

[125] Tr. at 295-296.

[126] Tr. at 327.

[127] Tr. at 296-297, 332.

[128] Tr. at 301-303, 318, 320-323.

MONTALVO V. SBEC
0038

With respect to rub downs in particular, Mr. Meguire said that it is fine for a coach to rub down an athlete before a competition, but it is not appropriate for a coach to massage or rub down an injured area as a form of therapy. He stated that someone without the expertise of a trainer would lack the ability to discern whether an injured area should be massaged, and that massaging an acutely injured or inflamed area can delay healing and prolong pain. He also said that, in his department, females rub down females.[129]

Mr. Meguire testified that there were whirlpools available for Mr. Montalvo's use at all times.[130] However, the training room is not open to the coaches over spring break and Easter break, although the coaches can call and get the trainers to come and open the room up.[131]

Mr. Meguire is familiar with V.S. because she was one of the top athletes at Rio Grande City HS. She came to the trainer for treatment of an injury to her "quad," a calf injury, and shin splints. She came to the trainer on April 1, 2008, and received some attention to her quad and shin splints. She did not come to the trainer for a hamstring injury.[132]

*Linda Lu* is presently a teacher in Mission, in the Sharyland Independent School District. She had previously been employed at the Rio Grande City CISD for three years, including the 2007-2008 academic year, where she coached track as an assistant to Mr. Montalvo.[133]

Ms. Lu testified that she knew V.S. According to Ms. Lu, V.S. was not trustworthy because "her stories would always change." Further, said Ms. Lu, V.S. had a reputation for being untruthful.[134] Ms. Lu stated that she never saw Mr. Montalvo do anything inappropriate with V.S. or any of the other girls.[135]

---

[129] Tr. at 303-307. He stated that it is an unwritten rule in his department (the trainers' department at Rio Grande City HS) that male trainers not be alone with female athletes. *Id.* at 318-320.

[130] Tr. at 310-312.

[131] Tr. at 329, 331.

[132] Tr. at 297-300.

[133] Tr. at 497-499.

[134] Tr. at 500.

[135] Tr. at 500.

As to stretching, Ms. Lu said that she saw Mr. Montalvo stretch girls, which was not inappropriate. She heard no complaints about it.[136]

Ms. Lu also saw Mr. Montalvo give girls rub downs, and saw no problem with the practice.[137] Ms. Lu further stated that she had seen Mr. Montalvo give V.S. rubdowns at the field house, on the mats, once a week.[138] Ms. Lu said that she stayed at practice until the last girl left, but then said she did not stay every single time.[139] Ms. Lu herself gave V.S. massages while she was injured, after she told Ms. Lu that she was seeing a doctor in Mexico.[140]

With respect to phone calls, Ms. Lu was aware that Mr. Montalvo spoke with V.S. Ms. Lu thought it might have been daily because Student 1 had "a lot of issues," wanted attention, and had voiced an intent to commit suicide. As a result, said Ms. Lu, she did not believe there was anything wrong with Mr. Montalvo's talking to V.S. on a daily basis and for long times. She stated that coaches use positive reinforcement to help their student athletes succeed, and communication is key.[141] Mr. Montalvo would read inspiring quotations to V.S. and discuss them with her; Ms. Lu said, "I thought it was great."[142] Further, she suggested, as to the length of the calls, V.S. could fixate on something, at times going "to the extreme."[143] And, according to Ms. Lu, Mr. Montalvo lived in a rural area with poor telephone service and frequent interruptions in service during a conversation.[144]

---

[136] Tr. at 500-501.

[137] Tr. at 501-502.

[138] Tr. at 518-520.

[139] Tr. at 520.

[140] Tr. at 520-522.

[141] Tr. at 502-503, 511, 514-515. Ms. Lu said that, when a student speaks of suicide, it should be reported to someone. However, she also indicated that she did not know whether to believe any statements by V.S. to Mr. Montalvo about suicide, because V.S. "constantly changes her story" and says things just to get attention. Id. at 512-513. Ms. Lu thought that Mr. Montalvo's work with V.S. was enough to make sure she did not commit suicide. Id. at 515.

[142] Tr. at 515.

[143] Tr. at 513.

[144] Tr. at 514.

Ms. Lu recalled V.S.'s hamstring injury at the Donna meet in 2008. She said that she went to the school bus and checked the injury. Ms. Lu stated that she concluded V.S. needed to see the trainer, and she told this to V.S. Ms. Lu said she was not present when Mr. Montalvo discussed the matter with V.S.'s parents, who were in the bleachers. V.S. went up into the bleachers and spoke to her parents. Ms. Lu said that Mr. Montalvo referred V.S. to the trainer. However, V.S. did not, said Ms. Lu, seek out the trainers. Ms. Lu said that she did not follow V.S. to make sure she went to the trainers. She stated, "[W]e just say, 'Go to the trainer.' Whether or not she shows up or not, it's out of my hands." She said it was protocol to refer an injured student to the trainer, but it was up to the student and the parents to actually decide to go or not.[145]

Ms. Lu stated she never noticed a change in V.S.'s demeanor toward Mr. Montalvo in the spring of 2008. The following year, in the spring of 2009, Ms. Lu said, she was present at a track meet at Mission. She stated that V.S. was there, having apparently come on her own. Ms. Lu stated that V.S. was "right next to" Mr. Montalvo, seeking attention from him and others.[146]

In a written statement, Ms. Lu said that Mr. Montalvo was professional, conscientious, a role model to his colleagues, and meticulous as to rules.[147]

*Ricardo Saenz* is in his 12th year as the principal at North Grammar Elementary School in Rio Grande City.[148] Mr. Montalvo has been a P.E. coach at the school throughout Mr. Saenz's tenure there. Mr. Saenz stated that there has never been an occasion at the elementary school in which Mr. Montalvo engaged in misconduct or displayed a lack of integrity.[149] About

---

[145] Tr. at 504-508, 515-518, 521, 527.

[146] Tr. at 508-510.

[147] Respondent's Exhibit 11.

[148] Tr. at 620-621.

[149] Tr. at 622.

Mr. Montalvo, Mr. Saenz stated, "[H]e's a good man...He takes his job very seriously and he does a good job."[150]

Further, stated Mr. Saenz, all three of his children have been coached by Mr. Montalvo. Mr. Saenz's daughter, K.S., who is also a witness in this case, was coached by Mr. Montalvo. Mr. Saenz stated that he trusts Mr. Montalvo around his daughter.[151]

Mr. Saenz is acquainted with V.S. She was around the elementary school in the summer of 2008, working out and preparing for college track. He stated that V.S. seemed very comfortable with Mr. Montalvo during that time.[152]

When asked about phone calls between Mr. Montalvo and students, Mr. Saenz stated that there were phone calls between his daughter and Mr. Montalvo, but not over 400 calls. He noted that, when he talked to Mr. Montalvo, the phone sometimes got disconnected and they had to call each other back. According to Mr. Saenz, Mr. Montalvo lived in an area where the telephone gets disconnected frequently. Mr. Saenz stated that so many phone calls seem excessive, but to assess if there was impropriety, he would want to know what they were about.[153]

*Ofelia Guerra* and *Catherine Rubio* are Rio Grande City CISD employees who participated in two prayer meetings organized in the spring of 2008 by Mr. Montalvo or his sister. Persons prayed for favorable outcomes for V.S., following her injury, in upcoming track meets. Mr. Guerra and Ms. Rubio stated that they observed V.S. interacting comfortably with Mr. Montalvo.[154]

*Ricardo Altahif* is an employee of the Rio Grande City CISD who worked with Mr. Montalvo in 2007-2008. Mr. Altahif stated that Mr. Montalvo said V.S. had mentioned

---

[150] Tr. at 622-623. See also Respondent's Exhibit 19.

[151] Tr. at 623.

[152] Tr. at 623-634.

[153] Tr. at 644-649.

[154] Tr. at 689-701. These witnesses' written statements are at Respondent's Exhibits 10 and 17.

suicide. About 30 days later, Mr. Montalvo said that he was still talking to V.S., who continued to have problems. Mr. Altahif told the school counselor about V.S. because, he said, that is protocol when a student talks about suicide, although there is no written rule to that effect.[155] In a written statement, Mr. Altahif spoke highly of Mr. Montalvo as a coach and educator.[156]

*Roel Gonzalez* is the Superintendent of the CISD. He testified that Mr. Montalvo was on two years of paid administrative leave pending his criminal trial, and upon his acquittal was reinstated as a teacher with the CISD. Mr. Gonzalez further stated that, if he heard that a teacher had made multiple phone calls to a student and allowed a student to use the Jacuzzi in the teacher's own master bath, there would be cause to initiate an investigation; however, Mr. Gonzalez went on to say that he would need to gather evidence and look at all the facts before deciding to take any action. Specifically as to the phone calls, he stated that it would be important to know what they were about. He said that not every mistake in teaching is a matter for punitive action, and sometimes a teacher just needs to be counseled to do something better the next time. Mr. Gonzalez said that it is protocol for an injured student athlete to be sent to the trainer. He went on to say that, while parents are part of the decision making team concerning whether to go to the trainer, they are not the sole deciders.[157]

### d.  Rio Grande City HS Students and Parents

*K.A.* graduated from Rio Grande City HS in 2007 and went on to college at the University of Texas at San Antonio. Mr. Montalvo was her coach throughout her public school career, starting in the first grade. He is also her godfather; she asked him to become her godfather for her Catholic confirmation, when she was a sophomore in high school.[158]

K.A. has known V.S. since middle school, and they were teammates on the track team. They were friends throughout school, and remained friends after they both went to college.

---

[155] Tr. at 856-860. Mr. Altahif's testimony suggested that Mr. Montalvo said V.S. had talked about suicide more than once, but it is not entirely clear. Respondent's Exhibit 7.

[156] Respondent's Exhibit 7.

[157] Tr. at 864-878.

[158] Tr. at 451, 460.

Nonetheless, K.A. testified, she kept V.S. at a distance with respect to trust because, in K.A.'s experience, V.S. was a liar. Further, said K.S., V.S. had a reputation among others as a liar.[159] In a written statement, K.S. said:

> V was never one to be trusted. She is a liar and a manipulator. She manipulated people into getting what she wanted. She would lie and cheat her way out of any situation that meant her not having to get in trouble or suffer the consequences for her actions. For years I watched as she lied and manipulated her parents into thinking she was someone she wasn't.[160]

Frequently, said K.A., she talked on the phone with Mr. Montalvo, sometimes late into the night due to her schedule. She stated that she confided in him about her performance in track, problems in her family, and things going on at school, and the conversations lasted hours. Her parents were aware of the calls, she said. She stated that Mr. Montalvo did not talk to her about any problems with his wife, except to mention her concerns that summer track took so much of his time.[161]

K.A. said that Mr. Montalvo sometimes massaged her injured hamstring when no one else was available. She saw him rubbing down other athletes, again if no one else was available to do it. K.A. saw Mr. Montalvo rubbing down V.S. at a track meet, but not after practice.[162]

In the summer of 2008, K.A. was training with Mr. Montalvo. She said that V.S. would still show up at track practices and weight room workouts, and she came to a birthday party for A.G. at Mr. Montalvo's house.[163]

---

[159] Tr. at 452-455.

[160] Respondent's Exhibit 6.

[161] Tr. at 466-467, 475-477, 481-482.

[162] Tr. at 472-474.

[163] Tr. at 478-479.

MONTALVO V. SBEC
0044

K.A. testified that, in the spring of 2009 (the year following graduation), V.S. was very troubled, had a boyfriend of whom her parents disapproved, and posted on Facebook that she was pregnant.    V.S. did not have a child from the pregnancy she claimed at that time.[164]

According to K.A.'s written statement, Mr. Montalvo is a caring, inspiring, generous, and trustworthy coach.[165]

*Dina Pena* lives in Rio Grande City, in the neighborhood where Mr. Montalvo lives. Ms. Pena regards Mr. Montalvo as a friend, and he coached her two daughters in track. One of her daughters, E.P., was a teammate and classmate of V.S.[166]  Ms. Pena stated that she had been acquainted with V.S. and her parents since V.S. and E.P. had participated in summer track in elementary school.[167]  According to Ms. Pena, V.S. was not a very truthful person.[168]  In a written statement, Ms. Pena said that Mr. Montalvo is a mentor to her daughters and has their wholehearted trust.[169]

*E.P.* graduated from Rio Grande City HS in 2008 and has since graduated from the University of Texas at Austin.  She ran track in high school, and Mr. Montalvo has been her coach since she was in seventh grade. She stated that she has known V.S. since they were in elementary school, and knows her fairly well.  They used to be friends, stated E.P., but they have had a falling out.[170]

---

[164]  Tr. at 460-462.

[165]  Respondent's Exhibit 6.

[166]  Tr. at 486-488.

[167]  Tr. at 488.  V.S. actually began summer track in middle school.

[168]  Tr. at 489.

[169]  Respondent's Exhibit 12.

[170]  Tr. at 533-535.

When asked about V.S.'s reputation for truthfulness, E.P. replied that V.S. "lies consistently."[171] E.P. also stated that V.S. had asked her to lie for her.[172] In a written statement, E.P. said about V.S. that she "is a manipulative person and compulsive liar."[173]

Concerning phone calls with Mr. Montalvo, E.P. stated that, as a freshman, she talked with him on the phone about three times per week. As she grew more confident in her athletics, she spoke with him less, she said, but around important competitions she had lengthy conversations of more than an hour with him.[174] She said, "He talked to all of us on the phone late at night."[175]

E.P. said that if V.S. was injured, there was no doubt in E.P.'s mind that Mr. Montalvo would tell V.S. to go to the trainer. Further, agreed E.P., Mr. Montalvo would not tolerate a refusal to go to the trainer.[176]

E.P. sometimes saw Mr. Montalvo massage V.S. during practice. Also, said E.P., sometimes V.S. would be around after practice.[177]

With respect to stretching, E.P. testified that Mr. Montalvo stretched her by having her place her back against a wall, immediately adjacent to a doorway, and he would move her leg up, past her body, and into the open doorway. She stated that she was very flexible, and no one else was strong enough to stretch her adequately. She further said her mother was sometimes present for the stretching.[178]

---

[171] Tr, at 536-537.

[172] Tr. at 544.

[173] Respondent's Exhibit 13.

[174] Tr. at 537.

[175] Tr. at 569.

[176] Tr. at 573, 594-595.

[177] Tr. at 586-587.

[178] Tr. at 550-551, 579-580.

E.P. testified that, in the spring of 2008, Mr. Montalvo talked to E.P. about V.S.'s possibly doing something to hurt herself. E.P. and V.S. had been good friends, and Mr. Montalvo was trying to determine if, in E.P.'s words, this was "just to get more attention."[179] E.P. told Mr. Montalvo that she thought any suicide threat by V.S. was false.[180]

E.P. stated that she saw no change in V.S.'s demeanor toward Mr. Montalvo in their senior year.[181] Further, she stated, after graduation V.S. came to a birthday celebration for A.G. and asked Mr. Montalvo why he had not thrown a party for her birthday.[182]

E.P. said that Mr. Montalvo was like a father figure to her, and he never did anything to break her trust in him.[183] She described him as an "exceptional educator and human being" who taught discipline and perseverance and was a positive influence in her life.[184]

*A.G.* ran track at Rio Grande City HS, from which she graduated in 2007. She still lives in Rio Grande City, and works at a stadium in the area.[185]

A.G. testified that she has known V.S. since A.G. was a freshman in high school and V.S. was in the eighth grade. She said that V.S. was a friend. According to A.G., V.S. was not known for being honest.[186] A.G. further asserted, in a written statement, that V.S. had asked her to lie for her.[187]

---

[179] Tr. at 567-569.

[180] Tr. at 570.

[181] Tr. at 552.

[182] Tr. at 558.

[183] Tr. at 538.

[184] Respondent's Exhibit 13.

[185] Tr. at 604-605.

[186] Tr. at 605-606, 610.

[187] Respondent's Exhibit 15.

In June 2008, said A.G., her father was sick, so Mr. Montalvo threw a little dinner party for her birthday. A.G. stated that she invited three girls, one of whom was V.S. A.G. testified that when V.S. walked in, she was upset and said, "Oh, Coach, you never do this for me."[188]

During that same summer, said A.G., V.S. was around, working out in the presence of Mr. Montalvo, and she displayed no fear of him.[189]

*Baldemar Garza* is an attorney in Rio Grande City. He is a friend of Mr. Montalvo, and Mr. Montalvo coached and trained Mr. Garza's son, who went on to run track at Cornell University. Mr. Garza also consulted with Mr. Montalvo about his criminal case.[190]

Mr. Garza testified that he has seen V.S. interact with Mr. Montalvo on many occasions, including during the summer of 2008, and that she behaved normally.[191]

Mr. Garza said that he is aware Mr. Montalvo rubbed down athletes, including female athletes. Mr. Garza saw nothing inappropriate about the practice.[192] As to the phone calls between Mr. Montalvo and V.S., Mr. Garza noted that his wife is a teacher, and he said that teachers often end up listening to kids' problems because their needs are not met at home.[193] He also suggested that his son did not always reveal injuries to him because he wanted to compete, and good athletes sometimes do that.[194] Further, when asked about students using Mr. Montalvo's Jacuzzi, Mr. Garza noted that Mr. Montalvo had asked him to make the pool at Mr. Garza's home available to injured student athletes from time to time.[195] He stated that he believes Mr. Montalvo is a dedicated and caring coach.[196]

---

[188] Tr. at 609-610.

[189] Tr. at 614.

[190] Tr. at 651-653.

[191] Tr. at 654-656.

[192] Tr. at 656.

[193] Tr. at 661.

[194] Tr. at 661.

[195] Tr. at 662.

[196] Tr. at 657. A written statement of Mr. Garza's is at Respondent's Exhibit 14.

*K.T.* is a student at the University of Texas at Kingsville, where she runs track. K.T. has known Mr. Montalvo for six years, starting with his being her coach in summer track, then her high school coach. She graduated from Rio Grande City HS in 2010 and was a teammate of V.S. for two years. K.T. said that she and V.S. were close friends in K.T.'s sophomore year.[197]

K.T. testified that V.S. was "clingy" with Mr. Montalvo, and her behavior toward him did not change during the time K.T. was around them, including the spring and summer of 2008.[198] K.T. said that, at the time of the Mission track meet in the spring of 2009, V.S. came and wanted to ride with the team on the bus, but could not because she was not part of the school. At the meet, said K.T., V.S. was jumping on Mr. Montalvo's back.[199]

K.T. recalled the state meet of 2008 in Austin, for which she was the only Rio Grande City female track athlete to qualify. She said that V.S. and E.L. went along, too, because they were the athletes who had worked hardest at practice that year. According to K.T., Mr. Montalvo called each girl in, one by one, to his room for a talk. He told K.T. what she had to do and not to be nervous. He gave her a necklace that his sister had made, and a big hug, like a father would give. She said there was nothing inappropriate about the interaction. She estimated she was with him for about 30 minutes, and it did not seem to her that the other girls were with him for any longer.[200]

When asked about her opinion concerning whether V.S. is a truthful person, K.T. replied, "I honestly think that she would do anything to get what she wants." Referring to lying, K.T. said V.S. "knows that she can get away with it with her parents and anybody else."[201]

---

[197] Tr. at 668-669. Coach Lu testified that K.T. and V.S. did not always like each other. Tr. at 531-532. According to K.T., she had a falling out with V.S. after a traffic accident in which V.S. was a driver and K.T. was her passenger. K.T. testified that V.S. inappropriately tried to place all the blame on the driver of another car, and then V.S.'s mother urged them to sue for no reason. K.T. said this incident pushed her away from V.S. and V.S.'s family. Tr. at 676-677.

[198] Tr. at 670.

[199] Tr. at 670-671.

[200] Tr. at 673-676, 680-682.

[201] Tr. at 677.

K.T. was at the Donna meet, near V.S., when V.S. injured her hamstring. K.T. stated that the coaches told V.S. to go to the trainer, and she went.[202]

*K.S.* is a student in high school and the daughter of Ricardo Saenz, another witness in this case. K.S. has been coached by Mr. Montalvo in summer track and high school. She said that she knows V.S. from summer track in years past, but they were never high school track teammates. K.S. stated that, when she was in middle school, she worked out with the high school athletes, and she saw V.S. around Mr. Montalvo in 2008, including that summer. K.S. said that V.S. was outspoken and friendly with Mr. Montalvo.[203]

As to V.S.'s reputation for truthfulness, K.S. stated that she always heard people saying that V.S. was not a very truthful person.[204]

In a written statement, K.S. said, "I have attended many track meets all around the United States under [Mr. Montalvo's] care and not once has he disrespected me in any way...I believe Coach Montalvo is a good and decent man who is genuinely respectful and professional with his athletes."[205]

*A.B.* is a 17-year-old student who was coached by Mr. Montalvo for about one year in high school. A.B said that she is acquainted with V.S., having met her a couple of times during track season. They were not, however, teammates; V.S. had graduated by the time A.B. joined the track team.[206]

A.B. testified that V.S. has a reputation in the community for dishonesty.[207] A.B. also testified that, during practices in the summer of 2008, V.S. "always tried to get [Mr. Montalvo's]

---

[202] Tr. at 678-679.

[203] Tr. at 711-713.

[204] Tr. at 714.

[205] Respondent's Exhibit 18.

[206] Tr. at 719-720.

[207] Tr. at 721.

attention and distract him while he was trying to coach the track team."[208] Further, said A.B., at the 2009 Mission track meet, V.S. wanted to ride on the bus, but Mr. Montalvo told her she could not. A.B. stated that, at that meet, V.S. "would try to get [Mr. Montalvo's] attention while he was coaching me during my jumping events," and V.S. was trying to hug Mr. Montalvo.[209]

A.B. said that Mr. Montalvo was never inappropriate with team members or V.S., did not slap girls on the backside, and was a good coach.[210] In a written statement, she said, "While being coached by Mr. Erasmo Montalvo in 2008 through 2009 he has shown nothing but total respect towards me... and my team mates."[211]

### 6.     Other Evidence

In evidence are copies of several greeting cards Mr. Montalvo sent to V.S. On the cards, Mr. Montalvo wrote notes repeatedly exhorting V.S. to work hard, stay close to her parents, follow her dreams, and remain focused.[212]

Also in evidence is a DVD recording, as well as a transcript, of the local television interview with Mr. Montalvo and V.S. about her scholarship.[213] In the interview, V.S. appears happy and excited, and seems comfortable in Mr. Montalvo's presence.

Police records associated with the investigation of sexual assault are in evidence.[214] In addition, Staff introduced a statement by the State's Advisory Board of Athletic Trainers about

---

[208] Tr. at 721.

[209] Tr. at 721-723.

[210] Tr. at 723.

[211] Respondent's Exhibit 8.

[212] Staff's Exhibit 5. V.S. testified that Mr. Montalvo gave birthday and Valentine's cards to all the girls on the team. Tr. at 44-45.

[213] Respondent's Exhibits 23 and 24.

[214] Respondent's Exhibits 21, 25-27.

the role of licensed athletic trainers[215] and University Interscholastic League acknowledgement forms signed by Mr. Montalvo.[216]

E.    ALJ's Analysis

### 1.    Witness Credibility

The evidence of the central allegations in this case – of sexual impropriety and assault – consists almost exclusively of the statements of the two persons involved, Student 1 and Mr. Montalvo. Therefore, their general credibility must be assessed.

As to V.S.'s credibility, Mr. Montalvo makes a number of arguments. First, he argues that she is not credible because she was widely reported to have behaved normally around Mr. Montalvo, even seeking out his company and attention, during and after the time of the alleged sexual abuse, and she appeared excited and happy in a video filmed with him shortly after the alleged sexual abuse occurred.

Second, Mr. Montalvo points to V.S.'s inconsistent statements concerning the number of times she was sexually penetrated by Mr. Montalvo. In her interview with the Child Advocacy Center, she stated that the she was raped only once, in the field house, and that the incident at Mr. Montalvo's house involved oral sexual contact only. In her testimony at the hearing, however, she was clear that she had been penetrated on both occasions. In addition, V.S. was inconsistent in her descriptions of how Mr. Montalvo allegedly offered to pay her $2,000 in exchange for sex. In her Child Advocacy Center interview, she stated that Mr. Montalvo told her he had heard she was "really good" and asked her if she would ever have sex with him. At Mr. Montalvo's criminal trial, V.S. testified that Mr. Montalvo just asked her to "suck on it." And at the hearing in this case, she stated that he did not explicitly ask for sexual conduct, but rather she inferred that he was seeking sex in exchange for money.

---

[215] Staff's Exhibit 6.

[216] Staff's Exhibit 8.

Finally, Mr. Montalvo argues that V.S.'s credibility is impugned by testimony in the record about her lack of truthfulness.

The ALJ does not find Mr. Montalvo's first and second arguments about V.S.'s credibility convincing. Ms. Garza-Louis testified persuasively that sexual abuse victims often exhibit a pattern of normal behavior around their abusers for appearances' sake and to try to correct the harmful situation. The ALJ gives no weight to the argument that V.S.'s normal and even exuberant demeanor in Mr. Montalvo's presence, well before her outcry and while V.S.'s world still revolved around the high school track team, in any way makes her accusations less likely to be true.[217] Nor is the ALJ persuaded that the noted inconsistencies in V.S.'s story diminish her general believability. Again, Ms. Garza-Louis testified convincingly that the stories of actual sexual abuse victims often change over time, and these changes may reflect disassociation and an attempt by the victim to diminish the magnitude of the experience. V.S.'s inconsistency about the number of times she was raped does not, therefore, indicate that she is not telling the truth. And the ALJ does not find her conflicting versions of the alleged sex-for-money discussion significant enough to cast general doubt on her credibility.

However, the ALJ is troubled by the considerable testimony in the record about V.S.'s overall propensity for dishonesty. Witness after witness – including several teammates who had known V.S. for years, as well as an assistant coach – offered testimony that V.S. is dishonest or has a reputation for being untrustworthy. Many of these witnesses spoke in unequivocal terms about V.S.'s tendency to lie. Coach Lu stated that V.S. is untrustworthy and her stories change. K.A. called her a "liar" and "manipulator" who "was never one to be trusted." E.P. said that V.S. "lies consistently," has asked E.P. to lie for her, and "is a manipulative person and compulsive liar." A.G. stated that V.S. was not known for being honest, and had asked A.G. to lie for her. K.T., when asked about V.S.'s truthfulness, stated, "I honestly think that she would do anything to get what she wants." K.T. stated baldly that V.S. knows she can get away with

---

[217] On the other hand, the ALJ is somewhat concerned by the fact that V.S., in April 2009, a full year after the events at issue in this case and around the time of her outcry, returned from college, accompanied the team to a track meet, and helped Mr. Montalvo coach, hugging him and seeking his attention. Ms. Garza-Louis's testimony did not adequately address why a victim would behave toward her abuser in this fashion so long after the abuse, after or about the time when she was making an outcry, and when she could easily avoid such close contact with him.

lying. Ms. Dina Pena said V.S. is not a very truthful person. K.S. and A.B. stated that V.S. had a reputation for lack of truthfulness.

Staff invites the ALJ and the Board to dismiss this notable body of testimony as coming from persons who "would naturally be biased in favor of their beloved coach."[218] This claim has no basis in the record.[219] On the contrary, the testimony of a number of the young athletes indicates that any "bias" on their part arose out of their direct experiences with a coach who treated them with respect and with a young woman who lied and asked some of them to lie for her. The chorus of voices casting doubt on V.S.'s credibility was corroborated by V.S.'s own admissions that she has lied about important matters, falsely telling the police that she was kidnapped and falsely telling family and friends that she was pregnant, on both occasions to manipulate, and to gain attention and sympathy, from someone in her personal life.

There is no similar evidence generally calling into question Mr. Montalvo's veracity. Any inconsistencies in his testimony[220] do not rise to the level of casting overall doubt on his credibility.

### 2.  Sexual Impropriety and Assault

Staff alleges, and V.S. testified, that Mr. Montalvo touched her inappropriately on multiple occasions, sexually penetrating her on at least one occasion.

V.S. tells a plausible story. Her assertions – that Mr. Montalvo massaged her frequently and in private, that his massages gradually became sexual, that he used his position of authority and trust to gain power over her and her family, and that he actually raped her – certainly could be true. Ms. Garza-Louis characterized V.S.'s account as believable, noting that these events, as

---

[218] Petitioner's Response to Respondent's Closing Argument at 1.

[219] In the same paragraph, Staff groundlessly speculates that the jury that acquitted Mr. Montalvo was biased. *Id.*

[220] For example, Mr. Montalvo made varying statements about whether he told V.S. to go to the trainer (despite what Mr. Montalvo characterized as Mr. Sanchez's refusal to allow her to go).

described by V.S., follow recognized patterns of sexual abuse. The ALJ agrees that, if considered in a vacuum, V.S.'s testimony would be extremely convincing.

However, whether something *could* be true is a different matter from whether it *is* true. The inquiry into whether V.S.'s story is accurate cannot occur in a vacuum, but must take into account the entirety of the evidence in this case. The evidence includes two very important factors. First, Mr. Montalvo, who testified at length in this hearing, denies these accusations. He, too, tells a plausible story – that of a hardworking coach trying to help a troubled, emotionally needy athlete deal with depression, overcome her anxieties, and be successful in high school and beyond. Second, there is the considerable evidence (discussed above) calling into question V.S.'s credibility as a witness. Mr. Montalvo's denials and V.S.'s problematic relationship with truth do not necessarily mean V.S.'s accusations in this case are false. Respected coaches can abuse their power and cover up their misdeeds, and dishonest people can be victims of heinous acts. However, Staff has the burden of proving its allegations by a preponderance of the evidence. The general plausibility of Mr. Montalvo's version of events and the evidence casting doubt on V.S.'s credibility highlight the need for evidence corroborating V.S.'s assertions.

Such corroborative evidence is scant. Staff asserts that the many phone calls between Mr. Montalvo and V.S. constitute corroborative evidence of the sexual abuse. There is, however, absolutely no evidence that the calls related to a romantic or sexual relationship or solicitation between them.[221]

Staff also places much reliance on the testimony of Ms. Garza-Louis that V.S.'s story is believable. As discussed above, the ALJ has found Ms. Garza-Louis's testimony effective in rebutting Mr. Montalvo's arguments that V.S. should not be believed because of her demeanor toward Mr. Montalvo and certain inconsistencies in her story. However, Ms. Garza-Louis is in a poor position to offer a meaningful view concerning the ultimate facts in this case: whether the alleged acts actually occurred or not. She is a counselor and has knowledge about behavioral

---

[221] The only evidence of any inappropriate content was V.S.'s testimony that Mr. Montalvo sometimes talked about problems with his wife (including sexual problems), a claim Mr. Montalvo denies. V.S. testified that much of the talk on the phone was about track.

patterns in sexual abuse situations; she was not shown to be an expert in general credibility or sorting out disputed facts. She has no direct knowledge of the events at issue. She has met none of the persons involved. She watched the DVD of V.S.'s interview at the Child Advocacy Center, but Ms. Garza-Louis did not listen to any of the testimony in this case. She did not hear V.S. or Mr. Montalvo testify. There is nothing in the record to indicate that she is familiar with Mr. Montalvo's detailed version of events. She did not hear the testimony of any of the many witnesses who raised serious concerns about V.S.'s dishonesty.

The most direct corroborative evidence of V.S.'s accusations of sexual abuse came from V.S.'s mother. Ms. Sanchez testified that V.S. was upset and crying upon returning from Mr. Montalvo's Jacuzzi one day. She further testified that V.S. was very late coming home one night, and, when Ms. Sanchez called Mr. Montalvo, she could hear V.S. crying in the background. Ms. Sanchez also testified that V.S. did not want Mr. Montalvo to accompany the family to Corpus Christi to talk to college personnel about the terms of the scholarship. This testimony tends to corroborate V.S.'s accusations. On the occasions when V.S. was crying, Ms. Sanchez was told that it was because V.S. was upset about her injury. This is certainly a possible explanation for her tears on the late-night occasion. It seems less plausible after the Jacuzzi visit, as Mr. Montalvo testified that V.S.'s leg felt better after using the Jacuzzi. However, the ALJ has concerns about the accuracy of Ms. Sanchez's recollections. Ms. Sanchez testified that she had no memory of a dramatic event described by both V.S. and her father, in which V.S. told her mother in the summer of 2008 that Mr. Montalvo had touched her, and Ms. Sanchez called her husband home, whereupon he got out a gun to use against Mr. Montalvo. Ms. Sanchez's corroborative testimony, therefore, while troubling, does not add enough to Staff's evidence to meet its burden of proof on the allegations of sexual abuse.

No witness corroborated V.S.'s statement that she received multiple daily massages from Mr. Montalvo. No one claimed to, upon leaving school, notice V.S. and Mr. Montalvo lingering alone together after practices. No teammate agreed with V.S. that Mr. Montalvo kept her alone with him in the hotel room at the state meet for more than the short time everyone else was with him. There is no physical evidence of sexual contact in this case, as exists in some rape or sexual abuse cases. Mr. Montalvo admitted to giving V.S. occasional rides home after track

meets, but there were only seven track meets after the alleged abuse started, and V.S. said that the inappropriate touching occurred 50 or more times.[222] Conflicting evidence about whether Mr. Montalvo slapped girls on the backside does not make it more likely that he sexually abused V.S. Nor does evidence that some people did not like the look of his stretching the athletes. That Mr. Montalvo rubbed down athletes also proves nothing, especially given that, at the time, the district had no policy against it. The ALJ cannot see any connection between V.S.'s allegations of sexual mistreatment and Mr. Montalvo's giving his athletes greeting cards with inspirational messages and costume jewelry made by his sister. Mr. Montalvo's poor judgment in allowing athletes to use the Jacuzzi in his master bath does not establish that he assaulted V.S. when she was in his home.

For the above reasons, this record does not support a finding that Mr. Montalvo touched Student 1 inappropriately, engaged in romantic or sexual conduct with her, or physically mistreated or abused her in violation of Code of Ethics Standards 3.2, 3.5, and 3.6.

### 3. Telling V.S. Not to Go to the Trainer

It is undisputed that V.S. did not see the trainer for her hamstring injury. It is also undisputed that district protocol required injured students be referred to the trainer. Staff alleges that Mr. Montalvo told V.S. that if she informed the athletic trainer she was injured, the trainer would not let her run in the district and regional track meets. This is the only allegation in the pleading concerning the trainer. While, surely, a coach's making such a factual assertion could not by itself be a sanctionable event, Staff's allegation implies that Mr. Montalvo actually prohibited V.S. from seeing the trainer or urged her not to go. The ALJ interprets the pleading to mean that Mr. Montalvo actively discouraged V.S. from going to the trainer.

Staff's main assertion seems to be that Mr. Montalvo was dominating V.S. and grooming her for sexual abuse by controlling her rehabilitation, placing himself in the caretaker role, and providing himself with a ready excuse to engage in physical contact with V.S. As discussed

---

[222] It is not even clear to the ALJ that V.S. asserted anything improper happened on the rides home. When asked in her Child Advocacy Center interview where the abuse occurred, she replied that it occurred at school and at Mr. Montalvo's home.

above, there is insufficient evidence in the record to support the allegations of sexual abuse. However, Staff also seems to argue that prohibiting or discouraging V.S. from going to the trainer, even without any sexual overtones, harmed her by denying her the proper treatment for her injury. Aside from grooming for sexual abuse, there was another reason why a coach would not want a trainer to require V.S. to sit out from the district meet. V.S. was a star athlete, and the team needed V.S. to compete in 2008 in order to win the district championship.[223]   If Mr. Montalvo prevented V.S. from seeing the trainer for her injury, he may have violated Standard 3.2, by knowingly treating a student in a manner that adversely affected the student's learning, physical health, mental health, or safety.   Or, Mr. Montalvo might have violated Standard 3.5, by intentionally, knowingly, or recklessly engaging in neglect of a student or minor.

V.S. testified that Mr. Montalvo told them the trainer might keep V.S. from participating in the district meet, and her failure to run could jeopardize her scholarship.  Her parents both echoed that testimony.  V.S. and her father testified that V.S.'s mother took her to Mexico for shots. Mr. Sanchez said the shots were Mr. Montalvo's idea.  V.S. said she never saw a doctor for her injury.  In contrast, Mr. Montalvo repeatedly testified that he told V.S.'s family he would prefer that she go to the trainer, but that Mr. Sanchez adamantly said he would "take care of it," and would take V.S. to a doctor.  According to Mr. Montalvo, V.S. and her parents refused to involve the trainer.  He varyingly said that he told V.S. to go to the trainer, that he did not do so but should have, and that he could not recall what he told her.[224]  Mr. Montalvo said he was under the impression that V.S. was seeing a doctor in Mexico.

This is a difficult factual issue, as there is potentially persuasive evidence on both sides. V.S. and her parents all testified that Mr. Montalvo did not want V.S. to go to the trainer, telling them that her scholarship might be taken away.  Their versions of events were consistent. However, as discussed above, there are concerns about the accuracy and credibility of the testimony of V.S. and her mother.  Further, the ALJ is unpersuaded by V.S.'s and her parents'

---

[223] Tr. at 408.

[224] Mr. Montalvo's testimony that he did not send V.S. to the trainer but should have sent done so could mean, as his argument suggests, that he should have *insisted* she see the trainer, despite her family's refusal.  *See* Respondent's Post-Hearing Reply Brief at 7.

assertions, and Staff's argument, that the family trusted Mr. Montalvo to the degree that they followed whatever advice he gave them about V.S.'s track career. It is undisputed that V.S., as a freshman, had a cardiac condition perceived as dangerous and possibly life-threatening, and that both her doctor and Mr. Montalvo advised V.S.'s parents not to let her run. Nonetheless, they allowed her to run. This uncontroverted fact strongly supports Mr. Montalvo's contention that V.S.'s parents were "extreme" about her track career and lends credibility to Mr. Montalvo's assertion that Mr. Sanchez insisted he would "take care of" his daughter's injury himself. Further, Coach Lu testified that she (and Mr. Montalvo) told V.S. to go to the trainer. In addition, given that V.S. was going to Mexico for shots, it is plausible that Mr. Montalvo believed she was under medical care for her injury. Coach Lu testified that V.S. told her she saw a doctor in Mexico for her injury. Mr. Meguire testified that parents do not have to agree to let their child go to the trainer, and can instead decide to take a child to the doctor, to Mexico for shots, or to do nothing at all in connection with an injury.

When the evidence on a factual issue is this confusing and close, there is essentially a tie, and the party with the burden of proof loses. Accordingly, the ALJ determines that Staff has failed to prove Mr. Montalvo told V.S. not to go to the trainer for her hamstring injury. Therefore, no violation of Code of Ethics Standard 3.2 or 3.5 was shown.[225]

### 4.     Telephone Calls

A coach's talking to a student by telephone 480 times over five months is certainly a matter to trigger concern. However, for the phone calls to violate the cited provisions of the Code of Ethics, they must have constituted knowing treatment of a student in a manner that adversely affected the student's learning, physical health, mental health, or safety; physical mistreatment, neglect, or abuse of the student; or soliciting or engaging in sexual conduct or a romantic relationship with a student. None of these was shown.

---

[225] To prove a violation of Standard 3.2, Staff would have to show that V.S. was harmed. To prove a violation of Standard 3.5, Staff would have to show that Mr. Montalvo's actions constituted neglect. The ALJ does not reach these questions because it was not shown that Mr. Montalvo prevented V.S. from going to the trainer, as alleged.

Mr. Ramirez, Mr. Saenz, and Mr. Gonzalez all testified that the content of numerous phone calls with a student would be an important factor in determining if there had been impropriety. It is undisputed that most of the telephone conversations between Mr. Montalvo and V.S. were about track. Mr. Montalvo stated that V.S. required constant attention and reinforcement and had to "hear it and hear it and hear it" so that she could believe in herself.[226] V.S.'s statement that Mr. Montalvo often repeated himself when talking to her corresponds with Mr. Montalvo's description of these interactions. Despite V.S.'s denial that she ever mentioned suicide to Mr. Montalvo, Mr. Montalvo's testimony that he spent so much time talking to V.S. in part because she had spoken of suicide is quite believable. Ms. Lu, Mr. Altahif, and E.P. all testified that Mr. Montalvo reported to them at the time that he was concerned about V.S. because she had mentioned suicide. Further, V.S. was dealing with an injury that impaired her performance in her senior year, and the spike in the number of calls coincided with the time of her injury. That V.S.'s emotional issues were related to her injury and track performance made them a legitimate subject of conversation between V.S. and her coach. And, there is testimony from other athletes that Mr. Montalvo's coaching involved talking to them by phone, too, and sometimes late at night.

There is no evidence that the phone calls with V.S. involved statements of love, affection, or attraction. The only evidence of improper content of the conversations is V.S.'s testimony that Mr. Montalvo sometimes spoke of having problems with his wife, saying that they did not have sex. Mr. Montalvo denies saying anything to that effect. While such remarks, if made to a student, would have been extremely inappropriate, they would not have adversely affected V.S.'s

---

[226] The repetitious tenor of the greeting cards in evidence is consistent with Mr. Montalvo's testimony about the phone calls. For example, one note on a card from 2006 reads:

> V., I am extremely proud of your accomplishments this past weekend…You make coaching fun & easy!…Stay with the same attitude & work ethic not only in sports but in life in general, and you will always be successful. You are truly a special person & athlete. You are one of the best athletes I have ever coached in the past 11 years of coaching track (& I have coached some very good runners & jumpers). Stay close to your parents because they are your biggest fans & they will always be their [sic] for you during your ups & downs in your life. Hats of [sic] to your parents they did an amazing job raising you! I just hope that my daughter grows up to be like you. Don't let anybody ever bring you down & may all your dreams come true.

Staff's Exhibit 5 (emphasis in original). As noted above, V.S. testified that Mr. Montalvo gave cards to all the girls on the team. Tr. at 44-45.

MONTALVO V. SBEC
0060

physical or mental health, constituted mistreatment or neglect, or by themselves amounted to solicitation or engagement in a sexual or romantic relationship. Nor would such remarks, by themselves, have indicated that Mr. Montalvo is unworthy to instruct or supervise youth. It would have been wise for Mr. Montalvo to have referred V.S. to a counselor instead of trying to address her needs himself, but that is a different matter, and one not pled in this case. Mr. Montalvo's telephone calls with V.S. did not violate the cited Code of Ethics provisions and should not subject him to sanction.

### 5.    Student Use of Mr. Montalvo's Jacuzzi

It is undisputed that Mr. Montalvo allowed students, including V.S., to use his Jacuzzi. While there is insufficient evidence to support a determination that Mr. Montalvo sexually assaulted V.S. while she was in his home to use the Jacuzzi, Mr. Montalvo unquestionably exercised bad judgment in opening his master bath to students, and especially to one female student alone – even if Mr. Montalvo's wife was at home at the time. However, such a poor decision did not violate the cited Code of Ethics provisions by adversely affecting students, mistreating or neglecting them, or constituting solicitation or engagement in a sexual or romantic relationship. Nor did this questionable decision, by itself, mean that Mr. Montalvo is unworthy to instruct or supervise youth.

### 6.    Summary and Recommendation

Staff has not proven its allegations by a preponderance of the evidence. Therefore, the ALJ recommends no sanction in this case.

## III. FINDINGS OF FACT

1.    Erasmo Montalvo, Jr., holds a Texas Educator Certificate issued by the State Board for Educator Certification (SBEC). The certificate was in full force and effect at all times material and relevant to this action.

2.    On August 4, 2011, the staff (Staff) of the Texas Education Agency (TEA) Educator Certification and Standards Division, on behalf of SBEC, sent a notice of hearing and

original petition to Mr. Montalvo proposing revocation of the certificate referred to in Finding of Fact No. 1.

3. The notice of hearing contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

4. The hearing was held January 9-12, 2012, before ALJ Shannon Kilgore at the State Office of Administrative Hearings (SOAH) in the William P. Clements Building, 300 West 15th Street, Fourth Floor, Austin, Texas. Staff was represented by attorneys Richard J. Ybarra and Merle Hoffman Dover. Mr. Montalvo appeared and was represented by attorneys Mark Robinett and Corey Tanner. The record closed on March 9, 2012, with the parties' submission of reply briefs.

5. In 2008, Mr. Montalvo was a track and field coach at the Rio Grande City High School (HS), part of the Rio Grande City Consolidated Independent School District (CISD). He was also the physical education coach at a CISD elementary school.

6. That same year, Student 1 (also referred to as "V.S."), a female senior under the age of 18, was on the high school track team coached by Mr. Montalvo.

7. Student 1 attended a track meet in Donna on March 1, 2008.

8. While at the Donna meet, V.S. met with a college recruiter and was offered a track and field scholarship to attend college in Corpus Christi the following year.

9. V.S. injured her hamstring at the Donna track meet and did not compete.

10. V.S. was a star athlete in her senior year, and the hamstring injury early in the season was an emotional blow to her.

11. District protocol required that injured students be sent to the trainer.

12. Assistant Coach Linda Lu told V.S. to go to the trainer.

13. Parents of injured athletes do not have to agree to let their children go to the trainer.

14. V.S. did not visit the trainer about her injury.

15. V.S.'s mother took V.S. to Mexico for shots to treat her injury.

16. There is insufficient evidence to support a finding that Mr. Montalvo prevented or discouraged V.S. from going to the trainer for her injury.

17. Mr. Montalvo did not allow V.S. to compete in the next three meets following the Donna meet.

18. Following her injury, V.S. underwent stretching, rub downs, ice baths, and whirlpool use under Mr. Montalvo's direction.

19. V.S. gradually began to work out following her injury, and resumed competing in early April 2008.

20. Mr. Montalvo gave V.S., and other students, rub downs.

21. There is insufficient evidence to support a finding that the rub downs were sexual and involved inappropriate touching.

22. On two or three occasions, student athletes visited Mr. Montalvo's home to use his Jacuzzi in the master bath. The athletes wore sports bras or bathing suit tops, and brief "bikers" shorts.

23. On one occasion, V.S. went alone to Mr. Montalvo's house to use the Jacuzzi.

24. There is insufficient evidence to support a finding that Mr. Montalvo sexually abused or assaulted V.S. when she went to use the Jacuzzi.

25. There is insufficient evidence to support a finding that Mr. Montalvo sexually abused or assaulted V.S. in the field house.

26. From February through June 2008, Mr. Montalvo engaged in approximately 480 phone calls with Student 1, with over 80 of the calls placed after 10:00 p.m.

27. The phone calls were about V.S.'s track performance and emotional issues. The calls did not relate to or constitute a sexual or romantic solicitation or relationship between Mr. Montalvo and V.S.

28. There is insufficient evidence to support a finding of any inappropriate touching, or sexual or romantic solicitation or relationship, between Mr. Montalvo and V.S.

29. There is insufficient evidence to support a finding that Mr. Montalvo knowingly treated V.S. in a manner that adversely affected her learning, physical health, mental health, or safety.

30. There is insufficient evidence to support a finding that Mr. Montalvo intentionally, knowingly, or recklessly engaged in physical mistreatment, neglect, or abuse of V.S.

31. V.S. graduated from high school in May 2008 and left for college that August.

32.   At some point during the 2008-2009 academic year, V.S. told a counselor at her college and her family that Mr. Montalvo had sexually assaulted her in the spring of 2008.

33.   In 2009, Mr. Montalvo was charged with two counts of second-degree felony improper relationship between educator and student.   He was indicted in October 2009, and acquitted of both counts following a jury trial.

## IV.  CONCLUSIONS OF LAW

1.   SBEC has jurisdiction over this matter.  Tex. Educ. Code §21.031.

2.   SOAH has jurisdiction over the hearing in this proceeding, including the authority to issue a proposal for decision with proposed findings of fact and conclusions of law. Tex. Gov't Code ch. 2003.

3.   Proper and timely notice of the hearing was provided to Mr. Montalvo. Tex. Gov't Code ch. 2001.

4.   Staff had the burden of proof.

5.   SBEC may take disciplinary action against an educator who has violated the Educator's Code of Ethics or is unworthy to instruct or supervise the youth of this state.  19 Tex. Admin. Code § 249.15(b)(2) and (3).

6.   The foregoing Findings of Fact do not support conclusions that Mr. Montalvo violated Standards 3.2, 3.5, or 3.6 of the Educators' Code of Ethics, 19 Tex. Admin. Code § 247.2(b)(3)(B), (E), and (F) [now § 247.2(3)(B), (E), and (F)].

7.   The foregoing Findings of Fact do not support a conclusion that Mr. Montalvo is a person unworthy to instruct or supervise the youth of this state.

8.   SBEC is not authorized to take disciplinary action against Respondent's Texas Educator Certificate.

SIGNED May 7, 2012.

SHANNON KILGORE
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant,*

v.

ERASMO MONTALVO,
*Appellee.*

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX E

TITLE 19. EDUCATION
PART 7. STATE BOARD FOR EDUCATOR CERTIFICATION
CHAPTER 249. DISCIPLINARY PROCEEDINGS, SANCTIONS, AND CONTESTED
CASES
SUBCHAPTER B. ENFORCEMENT ACTIONS AND GUIDELINES

19 TAC § 249.15  (2008)

§ 249.15. Disciplinary Action by State Board for Educator Certification

(a) Pursuant to this chapter, the State Board for Educator Certification (SBEC) may take any of the following actions:

(1) place restrictions on the issuance, renewal, or holding of a certificate, either indefinitely or for a set term;

(2) issue an inscribed or non-inscribed reprimand;

(3) suspend a certificate for a set term or issue a probated suspension for a set term;

(4) revoke or cancel, which includes accepting the surrender of, a certificate without opportunity for reapplication for a set term or permanently; or

(5) impose any additional conditions or restrictions upon a certificate that the SBEC deems necessary to facilitate the rehabilitation and professional development of the educator or to protect students, parents of students, school personnel, or school officials.

(b) The SBEC may take any of the actions listed in subsection (a) of this section based on satisfactory evidence that:

(1) the person has conducted school or education activities in violation of law;

(2) the person is unworthy to instruct or to supervise the youth of this state;

(3) the person has violated a provision of the educators' code of ethics;

(4) the person has failed to report or has hindered the reporting of child abuse or the known

criminal history of an educator as required by law and § 249.14 of this title (relating to Complaint, Required Reporting, and Investigation; Investigative Notice; Filing of Petition);

(5) the person has abandoned a contract in violation of the Texas Education Code, §§ 21.105(c), 21.160(c), or 21.210(c);

(6) the person has failed to cooperate with the Texas Education Agency (TEA) in an investigation; or

(7) the person has committed an act described in § 249.14(g) of this title (relating to Complaint, Required Reporting, and Investigation; Investigative Notice; Filing of Petition), § 249.12(b) of this title (relating to Administrative Denial; Appeal), or § 249.16(b) of this title (relating to Eligibility of Persons with Criminal Convictions for a Certificate under Articles 6252-13c and 6252-13d, Revised Civil Statutes).

(c) The TEA staff may commence a contested case to take any of the actions listed in subsection (a) of this section by serving a petition to the certificate holder in accordance with this chapter describing the SBEC's intent to issue a sanction and specifying the legal and factual reasons for the sanction. The certificate holder shall have 30 calendar days to file an answer as provided in § 249.27 of this title (relating to Answer).

(d) Upon the failure of the certificate holder to file a written answer as required by this chapter, the TEA staff may file a request for the issuance of a default judgment from the SBEC imposing the proposed sanction in accordance with § 249.35 of this title (relating to Disposition Prior to Hearing; Default).

(e) If the certificate holder files a timely answer as provided in this section, the case will be referred to the State Office of Administrative Hearings (SOAH) for hearing in accordance with the SOAH rules; the Texas Government Code, Chapter 2001; and this chapter.

(f) The provisions of this section are not exclusive and do not preclude consideration of other grounds or measures available by law to the SBEC or the TEA staff, including student loan default or child support arrears. The SBEC may request the Office of the Attorney General to pursue available civil, equitable, or other legal remedies to enforce an order or decision of the SBEC under this chapter.


SOURCE: The provisions of this § 249.15 adopted to be effective March 31, 1999, 24 TexReg 2304; amended to be effective December 16, 2007, 32 TexReg 9112

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX F


LexisNexis®

1 of 2 DOCUMENTS

TEXAS ADMINISTRATIVE CODE

\*\*\* ARCHIVE DATA \*\*\*

\*\*\* THIS DOCUMENT REFLECTS ALL RULES IN EFFECT AS OF DECEMBER 31,
2008 \*\*\*

TITLE 19. EDUCATION
PART 7. STATE BOARD FOR EDUCATOR CERTIFICATION
CHAPTER 249. DISCIPLINARY PROCEEDINGS, SANCTIONS, AND CONTESTED
CASES
SUBCHAPTER A. GENERAL PROVISIONS

19 TAC § 249.3   (2008)

§ 249.3. Definitions

The following words, terms, and phrases, when used in this chapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Administrative denial--a decision or action by the Texas Education Agency (TEA) staff to deny a person any of the following based on the withholding or voiding of certification test scores; the invalidation of a certification test registration; or evidence of a lack of good moral character or improper conduct:

(A) admission to an educator preparation program;

(B) certification (including certification following revocation, cancellation, or surrender of a previously issued certificate) or renewal of certification; or

(C) reinstatement of a previously suspended certificate.

(2) Administrative law judge (ALJ)--a person appointed by the chief judge of the State Office of Administrative Hearings (SOAH) under Texas Government Code, Chapter 2003.

(3) Answer--the initial responsive pleading filed in reply to factual and legal issues raised by a petition.

(4) Applicant--a party seeking any of the following from the TEA staff or the State Board for Educator Certification (SBEC): issuance of a certificate (including issuance of a

new certificate following revocation, cancellation, or surrender of a previously issued certificate); renewal of a certificate; or reinstatement of a suspended certificate.

(5) Cancellation--the invalidation of an erroneously issued certificate.

(6) Certificate--the whole or part of any certificate, permit, approval, endorsement, or similar form of permission issued by the TEA staff or the SBEC. The official certificate is the record of the certificate as maintained on the SBEC's website.

(7) Certificate holder--a person who holds a certificate issued under the Texas Education Code (TEC), Chapter 21, Subchapter B.

(8) Chair--the presiding officer of the SBEC, elected pursuant to the TEC, § 21.036, or other person designated by the chair to act in his or her absence or inability to serve.

(9) Chief judge--the chief administrative law judge of the SOAH.

(10) Code of Ethics--the Code of Ethics and Standards of Practices for Texas Educators, pursuant to Chapter 247 of this title (relating to the Educators' Code of Ethics).

(11) Complaint--a written statement submitted to the TEA staff that contains essential facts alleging improper conduct by an educator, applicant, or examinee, and provides grounds for sanctions.

(12) Contested case--a proceeding under this chapter in which the legal rights, duties, and privileges of a party are to be determined by the SBEC after an opportunity for an adjudicative hearing.

(13) Conviction--an adjudication of guilt for a criminal offense. The term does not include the imposition of deferred adjudication for which the judge has not proceeded to an adjudication of guilt, except as provided by Code of Criminal Procedure, Article 42.12.

(14) Disciplinary proceedings--contested case proceedings before the TEA staff, the SOAH, and the SBEC that commence when a request for hearing is timely filed under this chapter.

(15) Educator--a person who is required to hold a certificate issued under the TEC, Chapter 21, Subchapter B.

(16) Effective date--as applied to a non-rulemaking decision or action by the SBEC or the TEA staff, the date the decision or action becomes final under the appropriate legal authority.

(17) Examinee--a person who registers to take or who takes a basic skills examination prescribed by the SBEC for admission to an educator preparation program or a comprehensive examination prescribed by the SBEC for a certificate.

(18) Filing--any written petition, answer, motion, response, other written instrument, or item appropriately filed with the TEA staff, the SBEC, or the SOAH under this chapter.

(19) Good moral character--the virtues of a person as evidenced, at a minimum, by his or her not having committed crimes relating directly to the duties and responsibilities of the education profession as described in § 249.16(b) of this title (relating to Eligibility of Persons with Criminal Convictions for a Certificate under Articles 6252-13c and 6252-13d, Revised Civil Statutes) or acts involving moral turpitude.

(20) Informal conference--an informal meeting between the TEA staff and an educator, applicant, or examinee; the purpose of such a meeting being to give the person an opportunity to show compliance with all requirements of law for the granting or retention of a certificate or test score.

(21) Invalidation--rendered void; lacking legal or administrative efficacy.

(22) Law--the United States and Texas Constitutions, state and federal statutes, regulations, rules, relevant case law, and decisions and orders of the SBEC and the commissioner of education.

(23) Mail--certified United States mail, return receipt requested, unless otherwise provided by this chapter.

(24) Majority--a majority of the voting members of the SBEC who are present and voting on the issue at the time the vote is recorded.

(25) Moral turpitude--improper conduct including, but not limited to, the following: dishonesty; fraud; deceit; theft; misrepresentation; deliberate violence; base, vile, or depraved acts that are intended to arouse or to gratify the sexual desire of the actor; drug or alcohol related offenses as described in § 249.16(b) of this title (relating to Eligibility of Persons with Criminal Convictions for a Certificate under Articles 6252-13c and 6252-13d, Revised Civil Statutes); or acts constituting abuse or neglect under the Texas Family Code, § 261.001.

(26) Party--each person named or admitted to participate in a contested case under this chapter.

(27) Person--any individual, representative, corporation, or other entity, including the following: an educator, applicant, or examinee; the TEA staff, SBEC, or SOAH; any other agency or instrumentality of federal, state, or local government; or any public or non-profit corporation.

(28) Petition--the written pleading filed by the petitioner in a contested case under this chapter.

(29) Petitioner--the party having the burden of proof by a preponderance of the evidence in any contested case hearing or proceeding under this chapter. The term includes the following persons:

(A) the TEA staff;

(B) a person appealing the administrative cancellation of scores based on irregularities involving a TEA-administered test; and

(C) a person appealing the administrative denial of any of the following: (i) certification (including certification following revocation, cancellation, or surrender of a previously issued certificate) or renewal of certification; or (ii) reinstatement of a suspended certificate.

(30) Presiding officer--the chair or acting chair of the SBEC.

(31) Proposal for decision--a recommended decision issued by an ALJ in accordance with the Texas Government Code, § 2001.062.

(32) Quorum--a majority of the 14 members appointed to and serving on the SBEC pursuant to the TEC, § 21.033; eight SBEC members, as specified in the SBEC Operating Policies and Procedures.

(33) Reinstatement--the reactivation to valid status of a certificate suspended by the SBEC; the lifting or discharging of a suspension on a certificate.

(34) Representative--a person representing an educator, applicant, or examinee in matters arising under this chapter; in a contested case proceeding before the SOAH, an attorney licensed to practice law in the State of Texas.

(35) Reprimand--the SBEC's formal censuring of a certificate holder.

(A) An "inscribed reprimand" is a formal, published censure appearing on the face of the educator's virtual certificate.

(B) A "non-inscribed reprimand" is a formal, unpublished censure that does not appear on the face of the educator's virtual certificate.

(36) Revocation--a sanction imposed by the SBEC permanently invalidating an educator's certificate.

(37) Respondent--the party who contests factual or legal issues or both raised in a petition; the party filing an answer in response to a petition.

(38) Sanction--

(A) a disciplinary action by the SBEC, including a restriction, reprimand, suspension, surrender, or revocation of a certificate;

(B) a reasonable and lawful punitive measure imposed by the ALJ or presiding officer against a party, representative, or other participant involved in a disciplinary proceeding, hearing, or other matter under this chapter.

(39) State Board for Educator Certification--the SBEC acting through its voting members in a decision-making capacity.

(40) State Board for Educator Certification member(s)--one or more of the members of the SBEC, appointed and qualified under the TEC, § 21.033.

(41) Surrender--an educator's voluntary, permanent relinquishment and invalidation of a particular certificate in lieu of disciplinary proceedings under this chapter and possible revocation of the certificate.

(42) Suspension--a sanction imposed by the SBEC temporarily invalidating a particular certificate until reinstated by the SBEC.

(43) Test administration rules or procedures--rules and procedures governing professional examinations administered by the SBEC through the TEA staff and a test contractor, including policies, regulations, and procedures set out in a test registration bulletin.

(44) Texas Education Agency staff--staff of the TEA assigned by the commissioner of education to perform the SBEC's administrative functions and services.

(45) Unworthy to instruct or to supervise the youth of this state--the determination that a person is unfit to hold a certificate under the TEC, Chapter 21, Subchapter B, or to be allowed on a school campus under the auspices of an educator preparation program.

(46) Virtual certificate--the official record of a person's certificate status as maintained on the SBEC's website.

SOURCE: The provisions of this § 249.3 adopted to be effective March 31, 1999, 24 TexReg 2304; amended to be effective December 16, 2007, 32 TexReg 9112

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX G

## AUTHORIZING REINSTATEMENT OF CANCELLED TEACHER'S CERTIFICATE.

H. B. No. 754.]                    CHAPTER 157.

An Act to amend Article 2814 of the Revised Civil Statutes of the State of Texas, 1911, so as to confer upon the State Superintendent of Public Instruction the authority upon satisfactory evidence being presented, to reinstate a teacher's certificate theretofore cancelled by him and giving right of appeal to State Board of Education.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1.    That Article 2814, Revised Civil Statutes of the State of Texas, 1911, be so amended as to hereafter read as follows:

Article 2814.    Any certificate may be cancelled for cause by the authority issuing it; and the State Superintendent of Public Instruction shall have power to cancel any certificate upon satisfactory evidence that the holder thereof is conducting his school in violation of the laws of the State or is a person unworthy to instruct the youth of this State; provided, if any teacher holding a certificate to teach in the public schools of this State, shall enter into a written contract with any board of trustees to teach in any public school of this State, and shall, after making such contract and with out the consent of the trustees, abandon said contract, except for good cause, such abandonment shall be considered sufficient grounds for the cancellation of said teacher's certificate, and the same may be cancelled upon the complaint of said trustees, or either of them; provided, that before any certificate shall be cancelled, the holder thereof shall be notified, and shall have an opportunity to be heard, and he shall have the right of appeal from such decision to the State Superintendent, and the State Board of Education; provided, that when the State Superintendent shall have cancelled the certificate, the appeal shall be to the State Board of Education; and provided further that the State Superintendent shall have the authority; upon satisfactory evidence being presented, to reinstate any teacher's certificate theretofore cancelled under the provisions of this Article, and upon a refusal of the Superintendent to so reinstate such certificate, the applicant shall have the right of appeal to the State Board of Education.

SEC. 2.    The fact there is no adequate law upon the Statutes of this State providing for reinstating any teacher's certificate theretofore cancelled, creates an emergency and imperative public necessity that the constitutional rule requiring bills to be read on three several days be suspended and that this Act take effect and be in force from and after its passage, and it is so enacted.

Approved March 30, 1917.
Takes effect 90 days after adjournment.

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX H

# REVISED

# CIVIL STATUTES

OF THE

## STATE OF TEXAS

ADOPTED AT THE REGULAR SESSION OF THE
THIRTY-SECOND LEGISLATURE

## 1911



PUBLISHED BY AUTHORITY OF THE STATE OF TEXAS



AUSTIN PRINTING COMPANY
AUSTIN, TEXAS
1912

to the forms and rolls of previous years, when necessary, and they shall be carefully preserved for this purpose. [Id.]

Art. 2777. **Duty and powers of state superintendent as to.**—The state superintendent shall have authority to investigate the census of any county, to correct errors, and, in extreme cases when he believes gross errors have occurred, or that fraud has been practiced, he may, with the approval of the state board of education, reject any county's roll and require the census of the county to be retaken. [Id.]

Art. 2778. **Compensation of census trustees.**—For their services, the census trustees shall receive four cents per capita of the children of scholastic age taken by them in county districts, and three cents per capita in towns of twenty-five hundred inhabitants and upwards to five thousand inhabitants, and two cents per capita in cities of more than five thousand inhabitants; and the county superintendent shall receive one cent per capita of the scholastic population reported by him; but these amounts shall not be paid until the census of the county is accepted by the state superintendent, and shall be forfeited as follows: The trustee's compensation, if his work is rejected by the county superintendent, and the census of his district ordered retaken, and both the county superintendent's and the trustee's compensation, if the census of the county is rejected and ordered by the state superintendent and the state board of education to be retaken. [Id.]

Art. 2779. **Above articles apply to cities and towns, except, etc.**—The provisions of this chapter shall apply to the taking of the scholastic census in cities and towns constituting independent districts, except as specially provided herein below, to-wit: The census trustee shall be appointed by the president of the board of trustees, and a census trustee may be appointed for each ward or school subdistrict, at the discretion of the president of the school board making such appointment. The forms for the parent and the rolls shall show the street and house number, or location of the house or place in which each child resides. [Id.]

---

# CHAPTER FOURTEEN.

## TEACHERS' CERTIFICATES AND EXAMINATIONS.

| | Article. |
|---|---|
| Shall present valid certificate | 2780 |
| Salaries of teachers | 2781 |
| Instruction must be given in English | 2782 |
| Prescribed studies | 2784 |
| Shall keep records and make reports | 2784 |
| Shall attend summer normals and county institutes | 2785 |
| County board of examiners | 2786 |
| Applicant for certificate | 2787 |
| Applicant must know English | 2788 |
| Examinations must be conducted in English | 2789 |
| Examiners shall grade papers | 2790 |
| Applicant may receive lower grade certificate | 2791 |
| Duties of county superintendent | 2792 |
| Dates of examinations | 2793 |
| State board of examiners | 2794 |
| When papers shall be forwarded | 2795 |
| Examination of papers | 2796 |
| Kinds of certificates | 2797 |
| Classes of county certificates: record | 2798 |

| | Article. |
|---|---|
| Requirements for third grade certificate | 2799 |
| Requirements for second grade certificate | 2800 |
| Requirements for first grade certificate | 2801 |
| Permanent certificate | 2802 |
| Grades and qualifications for permanent certificate | 2803 |
| Building to higher grade certificates | 2804 |
| Normal school and summer school certificates | 2805 |
| University of Texas diplomas and certificates | 2806 |
| Diploma of College of Industrial Arts | 2807 |
| Certificates based on college degrees | 2808 |
| Course of study for first grade certificates in certain institutions | 2809 |
| City certificates | 2810 |
| Kindergartens | 2811 |
| Kindergarten certificates | 2812 |
| Extension of term of validity of certificates | 2813 |
| Cancellation of certificates | 2814 |

Article 2780. **Shall present valid certificate.**—Any teacher desiring to teach in any city, town or district in this state shall, before contracting with any

he acts as such, each year, and shall also attend, either as a pupil or teacher, a summer normal institute each alternate summer during the validity of the certificate, shall not be required to be re-examined; and the certificate held by the teacher thus attending shall be renewed for a time equal to the original term of validity of said certificate when the fact of such attendance shall have been duly and properly certified to the authority issuing said certificate; provided, that a teacher whose certificate is to be extended and held valid under the provisions of this article shall in no case have his certificate extended and continued valid, unless said teacher shall have faithfully attended the county teachers' institute each year, and also a summer normal institute in some county in Texas, during the validity of his certificate for not less than twenty full days each alternate summer; provided, further, that in no instance shall a teacher have his certificate extended and held valid under the provisions of this chapter who has not made a general average of at least seventy-five per cent at the last examination for teacher's certificate at which he was examined; provided, further, that in no instance shall a certificate be extended and continued valid under the provisions of this chapter where the teacher holding said certificate has failed to teach in the schools of this state each year during the validity of his or her certificate. [Act 1905, p. 263, sec. 125.]

Art. 2814.  Cancellation of certificate.—Any certificate may be canceled for cause by the authority issuing it; and the state superintendent of public instruction shall have power to cancel any certificate upon satisfactory evidence that the holder thereof is conducting his school in violation of the laws of the state, or is a person unworthy to instruct the youth of this State; provided, if any teacher holding a certificate to teach in the public schools of this state, shall enter into a written contract with any board of trustees to teach in any public school in this State, and shall, after making such contract and without the consent of the trustees, abandon said contract, except for good cause, such abandonment shall be considered sufficient grounds for the cancellation of said teacher's certificate, and the same may be canceled upon the complaint of said trustees, or either of them; provided, that, before any certificate shall be canceled, the holder thereof shall be notified, and shall have an opportunity to be heard, and he shall have the right of appeal from such decision to the state superintendent, and the state board of education; provided, that, when the state superintendent shall have canceled the certificate, the appeal shall be to the state board of education.  [Id. sec. 127.]

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX I

CAUSE NO. D-1-GN-12-002991

| | | |
|---|---|---|
| ERASMO MONTALVO, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| THE STATE BOARD FOR | § | |
| EDUCATOR CERTIFICATION, | § | |
| *Defendant.* | § | 200TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The State Board for Educator Certification, Defendant, has requested Findings of Fact and Conclusions of Law pursuant to Rule 296 of the Rules of Civil Procedure regarding that part of the Judgment in this case granting Plaintiff's request for a permanent injunction. In accordance with Rule 296, the Court enters the following Findings and Conclusions. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. Correspondingly, to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

### FINDINGS OF FACT

1. Erasmo Montalvo, Plaintiff, has shown by a preponderance of the evidence, that he will be irreparably harmed if a permanent injunction is not issued prohibiting the Defendant State Board for Educator Certification from treating as revoked or revoking his educator certificate based on the facts and allegations relied on by Defendant in SOAH docket No. 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.EC, until the appellate court issues its ruling in any appeal taken by Defendant.

1

2. Plaintiff has shown by a preponderance of the evidence that, based on the history of this case, the harm to him is imminent. It is probable that the Defendant will file a Notice of Appeal, claim that its Notice automatically supersedes the injunction, and represent that Plaintiff's educator certificate is revoked during the pendency of the appeal, (which may involve an indefinite extended period of time), during which Plaintiff's ability to obtain employment consistent with his experience, training, and education, would likely be significantly adversely affected.

3. The competing equities favor granting the injunction.

## CONCLUSIONS OF LAW

1. The educator certificate of Erasmo Montalvo, Plaintiff, was wrongfully revoked by Defendant State Board for Educator Certification, because the Board's decision to do so was:

    a. Not supported by substantial evidence;

    b. Arbitrary and capricious; and

    c. Characterized by a clearly unwarranted exercise of discretion.

2. Because the Board's decision was not supported by substantial evidence to the prejudice of the Plaintiff, the Court is authorized to reverse the Board's decision. Gov't Code §2001.174(2)(E).

3. Because the Board's decision was arbitrary and capricious, the Court is authorized to reverse the Board's decision. Gov't Code §2001.174(2)(F).

4. Because the Board's decision was characterized by a clearly unwarranted exercise of discretion, the Court is authorized to reverse the Board's decision. Gov't Code §2001.174(2)(F).

5. If Defendant State Board for Educator Certification is not enjoined from treating as revoked or revoking Plaintiff's educator certificate during the pendency of any appeal from the Judgment reversing its action, Plaintiff will suffer harm for which he has no adequate remedy.

6. Under the circumstances of this case, a permanent injunction is appropriate.

7. Rule 24.2(3) of the Texas Rules of Appellate Procedure authorizes the trial court to decline to permit the judgment to be superseded if Plaintiff posts the security ordered by the trial court in accordance with the Rule, if the judgment is not for money or an interest in property.

Signed on the 21ST day of MAY , 2013.

_____
JUDGE TIM SULAK

3

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant,*

v.

ERASMO MONTALVO,
*Appellee.*

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX J



TEXAS ADMINISTRATIVE CODE

\*\*\* ARCHIVE DATA \*\*\*

\*\*\* THIS DOCUMENT REFLECTS ALL RULES IN EFFECT AS OF DECEMBER 31, 2008 \*\*\*

TITLE 19. EDUCATION
PART 7. STATE BOARD FOR EDUCATOR CERTIFICATION
CHAPTER 249. DISCIPLINARY PROCEEDINGS, SANCTIONS, AND CONTESTED CASES
SUBCHAPTER A. GENERAL PROVISIONS

19 TAC § 249.5   (2008)

§ 249.5. Purpose

The purpose of this chapter is:

(1) to protect the safety and welfare of Texas schoolchildren and school personnel;

(2) to ensure educators and applicants are morally fit and worthy to instruct or to supervise the youth of the state;

(3) to regulate and to enforce the standards of conduct of educators and applicants;

(4) to provide for disciplinary proceedings in conformity with the Texas Government Code, Chapter 2001, and the rules of practice and procedure of the State Office of Administrative Hearings;

(5) to enforce an educators' code of ethics;

(6) to fairly and efficiently resolve disciplinary proceedings at the least expense possible to the parties and the state;

(7) to promote the development of legal precedents through State Board for Educator Certification (SBEC) decisions to the end that disciplinary proceedings may be justly resolved; and

(8) to provide for regulation and general administration pursuant to the SBEC's enabling statutes.

SOURCE: The provisions of this § 249.5 adopted to be effective March 31, 1999, 24 TexReg 2304; amended to be effective December 16, 2007, 32 TexReg 9112

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
*Appellant*,

v.

ERASMO MONTALVO,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLANTS' BRIEF

APPENDIX K

# SBEC Disciplinary Policy and Mission Statement

## DISCIPLINARY POLICY GUIDELINES

As provided in 19 Tex. Admin. Code (TAC) § 249.5, the primary purposes the State Board for Educator Certification (SBEC) seeks to achieve in educator disciplinary matters are to:

(1) protect the safety and welfare of Texas schoolchildren and school personnel;

(2) ensure educators and applicants are morally fit and worthy to instruct or to supervise the youth of the state; and

(3) fairly and efficiently resolve educator disciplinary proceedings.

The SBEC's focus on the safety and welfare of students is also reflected in the SBEC Mission Statement, Core Principles, and Goals that were adopted on February 6, 2009.

Without diminishing in any way the SBEC 19 TAC Chapter 249 procedural and substantive rights of educators to contest allegations of educator misconduct, it is the policy of the SBEC to fully investigate such allegations and, if those allegations are found to have merit, to ensure that any sanction that is imposed furthers these purposes.

A certified educator holds a unique position of public trust with almost unparalleled access to the hearts and minds of impressionable students. Therefore, the conduct of an educator must be held to the highest standard. Because SBEC sanctions are imposed for reasons of public policy, and are not penal in nature, criminal procedural and punishment standards are not appropriate to educator discipline proceedings.

### General Principles:

1. Because the SBEC's primary duty is to safeguard the interests of Texas students, educator certification must be considered a privilege and not a right.

2. SBEC disciplinary sanctions are based on educator conduct that is proved by a preponderance of the evidence, without regard to whether there has

been a criminal conviction, deferred adjudication or other type of community supervision, an indictment, or even an arrest. Under the Educators' Code of Ethics, an educator may be sanctioned for conduct underlying a criminal conviction even if the crime is not subject to sanction under the Texas Occupations Code, Chapter 53. An educator may also be sanctioned for conduct underlying a criminal conviction even if the conduct is not specifically listed in 19 TAC § 249.16, as long as the conduct renders the educator unworthy to instruct.

3. Because the SBEC recognizes that an educator's good moral character, as defined in 19 TAC § 249.3, constitutes the essence of the role model that the educator represents to students both inside and outside the classroom, criminal law, 19 TAC Chapter 247, the Educator's Code of Ethics, and 19 TAC Chapter 249, providing for educator disciplinary proceedings, are merely a minimum base line standard for educator conduct. Active community supervision, as well as conduct that indicates dishonesty, untruthfulness, habitual impairment through drugs or alcohol, abuse or neglect of students and minors, including the educator's own children, or reckless endangerment of the safety of others, may demonstrate that the person lacks good moral character, is a negative role model to students, and does not possess the moral fitness necessary to be a certified educator.

4. "Unworthy to instruct or to supervise the youth of this state," which serves as a basis for sanctions under 19 TAC § 249.15(b) (2), is a broad concept that is not limited to the specific criminal convictions that are described in Texas Education Code (TEC) §§ 21.058 and 21.060. The SBEC 19 TAC § 249.3(45) definition of "the determination that a person is unfit to hold a certificate under the TEC, Chapter 21, Subchapter B, or to be allowed on a school campus under the auspices of an educator preparation program" predates the adoption of TEC §§ 21.058 and 21.060, and is based upon the TEC, Chapter 21, Subchapter B grant of authority to the SBEC to "regulate and oversee all aspects of the certification, continuing education, and standards of conduct of public school educators." As a Texas Court of Civil Appeals ruled in the seminal case of Marrs v. Matthews, 270 S.W. 586 (1925), "unworthy to instruct" "means the lack of 'worth'; the absence of those moral and mental qualities which are required to enable one to render the service essential to the accomplishment of the object which the law has in view." Therefore, the moral fitness of a person to instruct the youth of this state must be determined from an examination of all relevant conduct, is not limited to conduct that occurs while performing the duties of a professional educator, and is not limited to conduct that constitutes a criminal violation or results in a criminal conviction.

5. Educators have positions of authority, have extensive access to students when no other adults (or even other students, in some cases) are present, and have access to confidential information that could provide a unique opportunity to exploit student vulnerabilities. Therefore, educators must clearly understand the boundaries of the educator-student relationship that they are trusted not to cross. The SBEC considers any violation of that trust, such as soliciting or engaging in a romantic or sexual relationship with any student or minor, to be conduct that may result in permanent revocation of an educator's certificate.

6. The SBEC recognizes and considers evidence of rehabilitation with regard to educator conduct that could result in sanction, denial of a certification application, or denial of an application for reinstatement of a certificate, but must also consider the nature and seriousness of prior conduct, the potential danger the conduct poses to the health and welfare of students, the effect of the prior conduct upon any victims of the conduct, whether sufficient time has passed and sufficient evidence is presented to demonstrate that the educator or applicant has been rehabilitated from the prior conduct, and the effect of the conduct upon the educator's good moral character and ability to be a proper role model for students.

## Mission Statement *(Back to top)*

Ensure the highest level of educator preparation to promote student achievement and to ensure the safety and welfare of Texas school children
*Adopted February 6, 2009*